THE STATE OF OHIO, APPELLANT, *v.* PENN, APPELLEE.

[Cite as *State v. Penn* (1991), 61 Ohio St.3d 720.]

(No. 90–859—Submitted February 19, 1991—Decided September 11, 1991.)

*Rocky A. Coss,* Prosecuting Attorney, for appellant.

*Drexel, a.k.a. "Fuzzy," Penn, pro se.*

*Gregory A. White* and *Robert F. Corts,* urging reversal for *amicus curiae* Ohio Prosecuting Attorneys Association.

*Donald Green,* urging affirmance for *amicus curiae* American Civil Liberties Union of Ohio Foundation, Inc.

SWEENEY, J. Section 14, Article I of the Ohio Constitution provides as follows:

"The right of people to be secure in their persons, houses, papers, and possessions, against unreasonable searches and seizures shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the person and things to be seized."

In *Marshall v. Barlow's, Inc.* (1978), 436 U.S. 307, 311–312, 98 S.Ct. 1816, 1820, 56 L.Ed.2d 305, 311, the high court stated as follows:

"The Warrant Clause of the Fourth Amendment protects commercial buildings as well as private homes. To hold otherwise would belie the origin of the Amendment, and the American colonial experience. * * *

"This Court has already held that warrantless searches are generally unreasonable, and that this rule applies to commercial premises as well as homes. * * *"

We believe that Ohio's parallel provision to the Fourth Amendment also protects commercial buildings in the same manner it protects private homes and offices, and thus, we hold that Section 14, Article I of the Ohio Constitution protects commercial buildings as well as private homes and offices. See, also, *State v. Pi Kappa Alpha Fraternity* (1986), 23 Ohio St.3d 141, 23 OBR 295, 491 N.E.2d 1129. This readily comports with our prior acknowledgements in both *State v. Akron Airport Post No. 8975* (1985), 19 Ohio St.3d 49, 51, 19 OBR 42, 43, 482 N.E.2d 606, 608, and *State v. VFW Post 3562* (1988), 37 Ohio St.3d 310, 315, 525 N.E.2d 773, 778, that the state may not require a blanket submission to warrantless searches at any time and for any purpose as a condition of doing business. Moreover, " * * * a warrantless administrative search may not be used to obtain evidence of general criminality." *VFW Post 3562, supra,* at 315, 525 N.E.2d at 778.

The record developed below indicates that the searches and resulting seizures at the Town Pharmacy were undertaken without a warrant. As this court stated in *Akron Airport Post No. 8975, supra,* at 51, 19 OBR at 43, 482 N.E.2d at 608:

"Where there is no search warrant, the burden falls on the state to show that a search comes within one of the judicially recognized exceptions:

"(a) A search incident to a lawful arrest;

"(b) consent signifying waiver of constitutional rights;

"(c) the stop-and-frisk doctrine;

"(d) hot pursuit;

"(e) probable cause to search, and the presence of exigent circumstances; or

"(f) the plain view doctrine."

The state contends that (b) above applies here, and that since Longociu gave consent to search the pharmacy, the warrantless search was valid. The state asserts that only Longociu had authority to consent to a search because under R.C. 4729.51 [1] only Longociu, as a registered pharmacist, could legally possess for sale any "dangerous drugs" that were located in the Town Pharmacy.

A review of the record indicates that the pharmacy board was notified by Longociu, albeit verbally, that he had quit his employment at the Town Pharmacy. In addition, Longociu had also told the Greenfield police before April 10 that he was no longer employed at the pharmacy. In our view, it is clear that since Longociu no longer worked for Penn, he had absolutely no authority to consent to a search of the pharmacy premises, because such authority automatically terminated when he quit his employment with the pharmacy on April 6, 1987. Here, the state's reliance on R.C. 4729.51 as a basis for Longociu's consent to search is misplaced. R.C. 4729.51 prohibits possession of dangerous drugs *for sale* by persons other than pharmacists or persons specifically listed in the statute. However, it is clear to us that Longociu cannot be said to have possessed the drugs at Town Pharmacy since he had terminated his employment there. Thus, it would logically follow that Penn, as owner of the pharmacy, was in possession of the drugs after Longociu quit his employment. R.C. 4729.51 does not appear to prohibit mere possession of dangerous drugs under its terms, rather it prohibits possession "for sale." A review of the record indicates that Penn closed the pharmacy on the same day that Longociu quit his employment; hence it could be concluded that the closure of the pharmacy indicates that Penn was not going to even attempt to sell any of the pharmaceutical drugs until he either hired a new pharmacist, or sold the business to someone who could legally possess the drugs *for sale* under R.C. 4729.51. In addition, both the police and the pharmacy board were notified that Longociu had terminated his employment with Penn at the pharmacy.

The fact that Longociu still possessed a key to the pharmacy does not, as the state urges, make his consent to search any more valid. Once Longociu

---

1. R.C. 4729.51 provides in relevant part:

"(A) No person other than a registered wholesale distributor of dangerous drugs shall possess for sale, sell, distribute, or deliver, at wholesale, dangerous drugs, except as follows:

"(1) A pharmacist who is a licensed terminal distributor of dangerous drugs or who is employed by a licensed terminal distributor of dangerous drugs may make occasional sales of dangerous drugs at wholesale[.]"

quit his employment with Penn, his right of access or control to the pharmacy ceased and he therefore relinquished his authority to validly consent to a search of the Town Pharmacy. See *Riley v. Gray* (C.A.6, 1982), 674 F.2d 522. To adopt the state's arguments in this vein would simply be exalting form over substance.

Therefore, since Longociu had no authority to consent to an entry and search of the pharmacy, we find that the entries and resulting searches that did take place violated Penn's rights under Section 14, Article I of the Ohio Constitution, as well as the Fourth and Fourteenth Amendments to the United States Constitution.

A review of the other judicially recognized exceptions to the warrant rule articulated in *Akron Airport Post No. 8975, supra,* reveals that none is applicable under the instant facts. While the state argues that the "plain view doctrine" allows for the seizure of records undertaken here, the state ignores the crucial fact that the initial intrusion upon which the plain view took place must itself be lawful. See *Coolidge v. New Hampshire* (1971), 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564; and *State v. Williams* (1978), 55 Ohio St.2d 82, 9 O.O.3d 81, 377 N.E.2d 1013. Since we have held that the initial intrusion into the pharmacy was not lawful, it necessarily follows that the "plain view doctrine" does not rescue the state's unreasonable warrantless search of Penn's pharmacy.

In addition to the foregoing, and contrary to the state's argument, the warrantless entries and searches perpetrated here are not legitimized under *Illinois v. Rodriguez* (1990), 497 U.S. ——, 110 S.Ct. 2793, 111 L.Ed.2d 148. As mentioned before, neither the pharmacy enforcement agents nor the Greenfield Police could reasonably believe that Longociu had the authority to consent to a search of the pharmacy, since both the pharmacy board and the police were on notice that Longociu had terminated his employment with Penn approximately four days earlier.

As held by the court of appeals below, while the State Board of Pharmacy is empowered to inspect records and files pertaining to the business of a pharmacy pursuant to R.C. 3719.13[2] and

---

2. R.C. 3719.13 provides as follows:

"Prescriptions, orders, and records, required by Chapter 3719. of the Revised Code, and stocks of dangerous drugs and controlled substances, shall be open for inspection only to federal, state, county, and municipal officers, and employees of the state board of pharmacy whose duty it is to enforce the laws of this state or of the United States relating to controlled substances. Such prescriptions, orders, records, and stocks shall be open for inspection by employees of the state medical board for purposes of enforcing Chapter 4731. of the Revised Code. No person having knowledge of any such prescription, order, or record shall divulge

3719.27,[3] the board cannot act as a surrogate for the police to obviate the constitutional duty of obtaining a search warrant. Under such circumstances, the state simply cannot bootstrap an invalid warrantless search into a valid "investigation" by agents of the State Board of Pharmacy. Moreover, as stated previously, a warrantless administrative search may not be used to obtain evidence of general criminality. *VFW Post 3562, supra,* 37 Ohio St.3d at 315, 525 N.E.2d at 778. While Penn was charged with one count of unlawful selling of drugs (R.C. 4729.28 [4]), we believe that the overall character of the investigation was an attempt to obtain evidence of crimes prohibited by R.C. Chapter 2925. For the state to now attempt to shelter itself behind the administrative powers of the State Board of Pharmacy as the primary justification behind the investigation and search of the pharmacy is somewhat disingenuous.

Finally, we reject the state's argument that Penn lacks standing to challenge the searches of Town Pharmacy, because as owner of the pharmacy, he had no reasonable expectation of privacy. See *Rakas v. Illinois* (1978), 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387. The state contends that since R.C. 4729.27 [5] requires that a registered pharmacist be in full and actual charge of the pharmacy, and since the pharmacy was not barricaded from the rest of the store under former Ohio Adm.Code 4729–9–11,[6] Longociu is the only person

---

such knowledge, except in connection with a prosecution or proceeding in court or before a licensing or registration board or officer, to which prosecution or proceeding the person to whom such prescriptions, orders, or records relate is a party."

3. R.C. 3719.27 states as follows:

"Person required, by Chapter 3719. of the Revised Code, to keep files or records shall, upon the written request of an officer or employee designated by the state board of pharmacy, make such files or records available to such officer or employee, at all reasonable hours, for inspection and copying, and accord to such officer or employee full opportunity to check the correctness of such files or records, including opportunity to make inventory of all stocks of controlled substances on hand. No person shall fail to make such files or records available or to accord such opportunity to check their correctness."

4. R.C. 4729.28 provides:

"No person who is not a registered pharmacist or a pharmacy intern under the personal supervision of a registered pharmacist shall compound, dispense, or sell drugs, dangerous drugs, and poisons."

5. R.C. 4729.27 states as follows:

"A person not a registered pharmacist, who owns, manages, or conducts a pharmacy as defined in section 4729.02 of the Revised Code, shall have in his employ, in full and actual charge of such pharmacy, a pharmacist registered under the laws of this state. Any registered pharmacist, who owns, manages, or conducts a pharmacy shall be personally in full and actual charge of such pharmacy, or shall have in his employ in full and actual charge of such pharmacy, a pharmacist registered under the laws of this state."

6. Former Ohio Adm.Code 4729–9–11 provided in relevant part:

who has standing to challenge the searches in issue. In our view, the state's contentions do not withstand constitutional scrutiny. As mentioned before, when Longociu quit his employment with Penn he relinquished all right of access and control over the pharmacy, in spite of the fact that he had not surrendered his key to the premises to Penn. Since it is obvious that Penn would have a reasonable expectation of privacy in the manner, ownership and control of his business, he most certainly has the requisite standing to challenge the searches and seizures undertaken at the Town Pharmacy.

As the high court stated in *Marshall v. Barlow's, Inc., supra,* 436 U.S. at 312–313, 98 S.Ct. at 1820, 56 L.Ed.2d at 311: "If the government intrudes on a person's property, the privacy interest suffers whether the government's motivation is to investigate violations of criminal laws or breaches of other statutory or regulatory standards."

Based on all the foregoing, we agree with the court of appeals' holding that the trial court erred in failing to suppress the evidence obtained as a result of the Greenfield Police Department's warrantless search of the Town Pharmacy, and hold that the cause must be remanded for a new trial. Accordingly, the judgment of the court of appeals is hereby affirmed.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS and H. BROWN, JJ., concur.

RESNICK, J., concurs separately.

HOLMES and WRIGHT, JJ., dissent.

ALICE ROBIE RESNICK, J., concurring. I concur with the majority, but on very narrow grounds. Specifically, I concur because the initial entry into the building which housed the pharmacy was unlawful. The pharmacist, Carl

---

"A pharmacist shall provide 'supervision and control' of dangerous drugs as required in division (B) of section 4729.55 of the Revised Code, and 'adequate safeguards' as required in division (C) of section 4729.55 of the Revised Code, by either of the following procedures:

"(A) Personal supervision by a registered pharmacist of the dangerous drug stock in a pharmacy when the dangerous drug stock is subject to theft or diversion.

"(B) Physical security of the dangerous drug stock, whenever personal supervision of it is not provided by a registered pharmacist, according to the following requirements:

"(1) Owners of prescription departments, which are to be closed at times the merchandise area of the same storeroom remains open, must request permission from the state board of pharmacy, submit a detailed plan of the prescription department barrier and obtain written approval before closing the prescription department.

"(2) The prescription department must be secured by a physical barrier at least seven feet high and suitable locks to prevent anyone from entering at a time the pharmacist is not present without obvious damage to the barrier of physical security provided."

See Ohio Monthly Record (1977–1978) 3–1044.

Longociu, had terminated his employment with the defendant before the entry. As such, Longociu lacked the authority to provide the consent required to permit a warrantless entry into the building. Had the Town Pharmacy been open for business, it would have been subject to inspection pursuant to the laws of Ohio. Likewise, had the Town Pharmacy employed a new pharmacist at the time of the search, that pharmacist would have been under a duty to make the records and stock available for inspection by agents of the State Board of Pharmacy and other specified officers. But these are not the facts before this court.

The Town Pharmacy was closed for business, and the building housing the defendant's pharmacy was locked. The registered pharmacist, Longociu, had terminated his employment on April 6th. The state asserts that three sections of the Revised Code provide for the warrantless inspection of defendant's pharmacy: R.C. 3719.13, 3719.27, and 4729.37. On the facts of this case, none of these statutes permitted the entry by the agent of the State Board of Pharmacy or police into the pharmacy in question solely on the authority or consent of its former pharmacist Longociu.

Initially, it should be noted that under R.C. 3719.09, Penn could lawfully possess the stock of drugs contained in his pharmacy. R.C. 3719.09 provides in part:

"Possession or control of controlled substances is authorized in the following instances:

"(A) Possession of controlled substances in the course of business by a manufacturer, wholesaler, practitioner, pharmacist, *owner of a pharmacy*, or other person authorized to administer, dispense, or possess controlled substances under Chapter 3719. or 4729. of the Revised Code[.]" (Emphasis added.)

The state contends that R.C. 3719.13 provides a right of inspection both by agents of the State Board of Pharmacy and by police officers. This section provides as follows:

"Prescriptions, orders, and records, required by Chapter 3719. of the Revised Code, and stocks of dangerous drugs and controlled substances, shall be open for inspection *only* to federal, state, county, and municipal officers, and employees of the state board of pharmacy whose duty it is to enforce the laws of this state or of the United States relating to controlled substances. * * * " (Emphasis added.)

The statute is aimed at protecting the confidentiality of persons who are taking prescription drugs or controlled substances. The last sentence of R.C. 3719.13 solidifies this conclusion by stating that "[n]o person having knowl-

edge of any such prescription, order, or record shall divulge such knowledge," except in certain specified situations not applicable here. Thus, R.C. 3719.13 is actually a limitation on access to records of prescription drugs, and specifies who may otherwise lawfully gain such access. The agents of the State Board of Pharmacy and other officers may gain access but the procedures of other statutes must be followed.

The state next contends that R.C. 3719.27 grants the State Board of Pharmacy the authority to conduct regulatory inspections, and therefore the entry and search of defendant's stock and records were lawful. R.C. 3719.27 reads as follows:

"Persons required, by Chapter 3719. of the Revised Code, to keep files or records shall, upon the written request of an officer or employee designated by the state board of pharmacy, make such files and records available to such officer or employee, at all reasonable hours, for inspection and copying, and accord to such officer or employee full opportunity to check the correctness of such files or records, including opportunity to make inventory of all stocks of controlled substances on hand. No person shall fail to make such files or records available or to accord such opportunity to check their correctness."

Longociu, as the pharmacist, was a person required by R.C. Chapter 3719 to keep the files and records of the Town Pharmacy. A question is raised as to whether his voluntary termination relieved him of that duty to keep such records, and thus whether he was required to make such files and records available for inspection. Moreover, R.C. 3719.27 requires the availability of records for inspection only upon a written request to inspect, and only at "all reasonable hours." Two additional issues are thus raised: (1) whether the written request was served upon the proper person, and (2) whether the request was for inspection at a reasonable hour. In this case, the request was made of a former employee who had terminated his position as pharmacist, and the inspection was conducted while the store was closed and no longer open for business. On these facts, and being cognizant that under R.C. 3719.09 Penn was authorized to lawfully possess the stock of controlled substances and records located at his store, it would appear that the conditions of R.C. 3719.27 were not met.

Even assuming Longociu remained the responsible person for keeping such records, the State Board of Pharmacy could not require him to unlock the building housing the pharmacy and gain entry to the pharmacy in this manner. Pursuant to R.C. 3719.27, it would appear that the proper person to grant entry would be only the owner of the store or one authorized to permit entry.

The state also contends that R.C. 4729.37 permitted the State Board of Pharmacy to inspect defendant's pharmacy. In relevant part this statute requires that " * * * [a]ll prescriptions shall be preserved on file at the pharmacy for a period of three years, subject to inspection by the proper officers of the law." While R.C. 4729.37 does allude to an inspection of prescription records by proper authorities, it is not applicable to the present case. This reference to inspections is merely to preserve the right of authorized persons to inspect such records, and cannot be read to be a grant of authority to enter a building which housed a business outside the regulatory scope of the State Board of Pharmacy.

The drug industry, because of its very nature and the ease with which abuses may occur, must be highly regulated. Inspection is a necessary and important part of the regulation. However, the case before us is a unique situation. Longociu, after terminating his employment and in view of the fact that the Town Pharmacy was closed, no longer had any authority to consent to the entry into the store. Appellee had authority to possess these controlled substances. After Longociu terminated his employment, and because the pharmacy was no longer open for business, appellee was the proper person upon whom to serve a written request for inspection. For these reasons I concur in the affirmance of the appellate decision.

HOLMES, J., dissenting. I dissent from today's majority opinion, which deals a blow to law enforcement efforts in the war against illegal drugs. The majority bases its determination upon the Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution without any conscious consideration of the statutory provisions controlling the sale, distribution, and possession of pharmaceutical drugs.

The salient facts in this case are that Drexel Penn purchased the Town Pharmacy from his sister, Jean Poole, in 1983. Carl Longociu, the pharmacist for Jean Poole when she owned the pharmacy, subsequently was employed by Penn as Town Pharmacy's pharmacist. On Town Pharmacy's application to the State Board of Pharmacy for registration as a terminal and wholesale distributor of dangerous drugs, Longociu was listed as the registered pharmacist. Longociu was also the applicant for the renewal of the registration with the United States Drug Enforcement Agency. Further, Longociu was at *all* times relevant to this case listed with the State Board of Pharmacy as the pharmacist in control of the drugs and records of Town Pharmacy.

On April 6, 1987, the Town Pharmacy closed indefinitely. At this time Longociu quit his position with the pharmacy; however, he failed to inform the State Board of Pharmacy of his successor.

Prior to the pharmacy's closing, the Greenfield City Police Department had initiated an investigation regarding its selling of drugs without prescriptions. On March 30, 1987, an informant purchased what was represented to be a controlled substance from Penn, but the substance was subsequently determined to be noncontrolled. Next, on April 10, 1987, following a request by the Greenfield Police to the State Board of Pharmacy for an inspection of the Town Pharmacy, Fred Williams, an enforcement agent of the State Board of Pharmacy, along with Greenfield Police Chief Greg Barr and others, met to investigate the matter. Agent Williams, believing Longociu to be in control of the Town Pharmacy, provided him with an inspection card requesting inspection of all drug stock and records pursuant to R.C. 3719.27. Longociu gave his permission to search the pharmacy.

The inspection of the Town Pharmacy revealed mislabeled, misbranded and outdated drugs in the pharmacy drug stock. Sample drugs were also found by the investigators. All of these items were seized on April 10, 1987. Later, on April 13 and May 7, agents returned to the pharmacy to continue the audit, which could not be completed on April 10. Upon their return they discovered many records missing, including DEA 222 forms, which are forms used to order drugs from manufacturers. On April 13 and May 7, all the records which indicated impropriety were removed, with receipts given to Longociu, the pharmacist, who was responsible for the premises.

As a result of the joint investigation by the State Board of Pharmacy and the Greenfield Police Department, Penn was charged with, and convicted of, one count each of unlawful selling of drugs in violation of R.C. 4729.28, trafficking in a counterfeit controlled substance in violation of R.C. 2925.-37(B), trafficking in drugs in violation of R.C. 2925.03(A)(1), and six counts of illegal processing of drug documents in violation of R.C. 2925.23(B)(1). The court of appeals reversed the conviction.

The central issue in this case is whether Longociu was vested with the authority to permit Town Pharmacy to be searched and its records reviewed. The majority mistakenly believes that since Longociu no longer was employed by Penn, he had absolutely no authority to consent to a search of the pharmacy premises. This belief is contrary to law and sets a dangerous precedent.

There are several provisions of the Revised Code and Administrative Code dealing with a pharmacist's duties in maintaining a pharmacy. First, R.C. 4729.27 requires that "[a] person not a registered pharmacist, who *owns,* manages, or conducts a pharmacy as defined in section 4729.02 of the Revised Code, *shall* have in his employ, in *full and actual charge* of such pharmacy, a pharmacist registered under the laws of this state. * * * " (Emphasis

added.) See, also, Ohio Adm.Code 4729-9-11. Moreover, in relation to the responsibility for holding and dispensing drugs, R.C. 4729.51(C) states that "[n]o person, except a licensed terminal distributor of dangerous drugs or a practitioner, shall purchase for the purpose of resale, possess for sale, or sell, at retail, dangerous drugs." See, also, R.C. 4729.51(A). Further, former Ohio Adm.Code 4729-5-23 (eff. Sept. 10, 1976) provided that the statutorily responsible pharmacist must conduct himself or herself as follows:

"(A) The pharmacist whose name appears on the terminal distributor of dangerous drugs license shall be in charge of the practice of the profession of pharmacy in the prescription department, including but not limited to maintaining all drug records required by state or federal law to be kept at the licensed location.

"(B) *If there is a change in the responsible pharmacist, the person to whom the terminal dangerous drug license has been issued shall notify the board of pharmacy within thirty (30) days thereof of the change and the name of the new responsible pharmacist.*

"(C) The person to whom the terminal dangerous drug license has been issued and all pharmacists on duty are responsible for compliance with all state and federal laws regulating the distribution of drugs and the practice of pharmacy." (Emphasis added.)

As noted above, before there could be a change in the "responsible pharmacist" under former Ohio Adm.Code 4729-5-23, the licensed terminal drug distributor was required to contact the State Board of Pharmacy and notify it of the change along with the name of the new pharmacist. Furthermore, in cases where the responsible pharmacist is also the holder of the wholesale or terminal distributor license, he or she must file written notice with the State Board of Pharmacy at least fourteen days prior to the proposed date of discontinuing business in order to terminate his or her responsibilities. Ohio Adm.Code 4729-9-07.[7] Clearly, under the foregoing provisions, Longociu had the authority to consent to an investigation of the records and inventory of the

---

7. Ohio Adm.Code 4729-9-07 states in pertinent part:

"(A) A wholesale or terminal distributor of dangerous drugs who plans to discontinue business activities shall file a written notice with the board of pharmacy. The written notice shall be submitted to the board of pharmacy in person or by registered or certified mail, return receipt requested, at least fourteen (14) days in advance of the proposed date of discontinuing business. * * *

"* * * *

"(C) Upon discontinuing business, the registrant shall return to the board of pharmacy, in person or by registered or certified mail, return receipt requested, the wholesale distributor of dangerous drugs license or the terminal distributor of dangerous drugs license for cancellation and the copies of the inventory required on paragraph (B) of this regulation."

controlled substances at the time the search was conducted. He could not disassociate himself from the pharmacy [8] until notification was received by the State Board of Pharmacy *and* a new responsible pharmacist was named. The mere fact that Longociu had quit Penn's employ did *not* relieve him of control or responsibility for the drugs or records.

Since I have established that Longociu was the responsible custodian of the controlled substances and records of the Town Pharmacy, the next query is whether the search conducted was properly executed. R.C. 3719.07(C) requires an owner of a pharmacy to keep records of all controlled substances received or dispensed by him or her in accordance with R.C. 3719.07(G). To enforce the pharmacy owner's duty to keep records, R.C. 3719.13 specifically authorizes inspections of the premises by stating:

"Prescriptions, orders, and records, required by Chapter 3719. of the Revised Code, and stocks of dangerous drugs and controlled substances, shall be open for inspection only to federal, state, county, and municipal officers, and employees of the state board of pharmacy whose duty it is to enforce the laws of this state or of the United States relating to controlled substances.  * * * "

Consistent with this statutory scheme, R.C. 3719.27 provides:

"Persons required, by Chapter 3719. of the Revised Code, to keep files or records shall, upon the written request of an officer or employee designated by the state board of pharmacy, make such files or records available to such officer or employee, at all reasonable hours, for inspection and copying, and accord to such officer or employee full opportunity to check the correctness of such files or records, including opportunity to make inventory of all stocks of controlled substances on hand. No person shall fail to make such files or records available or to accord such opportunity to check their correctness." See, also, Ohio Adm.Code 4729–5–17(F) ("Records of dispensing or administering drugs which may be required as evidence of a violation shall be released to a member, inspector, agent or investigator of the board of pharmacy or any state, county or municipal officer whose duty is to enforce the laws of this state or the United States relating to drugs and who is engaged in a specific investigation involving a designated person or drug upon his request. * * * ").

Thus, R.C. 3719.27 and Ohio Adm.Code 4729–5–17(F) not only require an inspection of records and drug stocks upon written request at all reasonable hours, they also prohibit anyone from failing to make the records available.

---

8. Longociu was not only the responsible pharmacist subject to the provisions set forth in Ohio Adm.Code 4729–5–23 and 4729–9–11, he was also the holder of the terminal distributor of dangerous drugs license, which made him subject to the provisions of Ohio Adm.Code 4729–9–07.

In the case *sub judice* Longociu had the authority to consent to the audit of the Town Pharmacy. In order to facilitate the investigation conducted by the State Board of Pharmacy and Greenfield Police Department, Longociu gave the authorities access to the pharmacy premises. In light of the fact that Longociu was still the "responsible pharmacist" for the pharmacy, his possession of the keys and his authority to permit the agents into the pharmacy were consistent with the cited statutes and rules. This is evidenced by the following colloquy that took place at the hearing on Penn's motion to suppress between Rocky A. Coss, on behalf of the state, and Frederick Williams, an enforcement agent with the State Board of Pharmacy:

"Q. [Coss] Now, on April 10, 1987, could you explain to the Court what you did at that time?

"A. [Williams] Went to Greenfield Police Department. I talked there with Chief Barr, Clay McPherson, and Officer Schottelkotte. They advised me that they had had an on-going [*sic*] investigation at the Pharmacy. I asked who the responsible person was, the Pharmacist there, and they advised me it was Carl Longocieu [*sic*]. They had contacted Carl Longocieu [*sic*], he came to the Police Department, and I talked to him for a few minutes, asked him general questions about the Pharmacy, who had keys and so on. He advised me there were several people that did have keys to the Pharmacy[.] Officer McPherson and Officer Schottelkotte then located the people who had keys other than Carl.

"Q. Why was that done?

"A. It's a Pharmacy regulation that only the Pharmacist may have a key to the Pharmacy unless they have an approved barricade.

"Q. Approved barricade for what?

"A. To maintain the security and integrity of the drugs in that Pharmacy.

"Q. In this situation when you inspected the Town Pharmacy, did you find an approved barricade?

"A. No, sir, it was not.

"Q. So the regulation was then that no-one [*sic*] else was supposed to have a key?

"A. Only the Pharmacist.

"Q. Was it at your direction then they pick up the other keys?

"A. Yes.

"Q. After you took that precaution, what did you do?

"A. We met Carl where he let us into the Pharmacy and started to do an inspection of the pharmacy.

"Q. At that time, was Carl Longocieu [*sic*], you indicated that he was the responsible person in charge. Would you explain what that term means in your job?

"A. Every Pharmacy or location where drugs are being stored have to have a responsible person. This person has to be either a Physician, a Pharmacist, a Registered Pharmacist, in the State of Ohio.

"Q. And who was that responsible person for Town Pharmacy?

"A. Carl Longocieu [*sic*]."

Thus, because Longociu was the only responsible pharmacist for the pharmacy and because the pharmacy lacked any approved barricade [9] erected pursuant to former Ohio Adm.Code 4729–9–11(B)(2), I conclude that the inspections conducted by the enforcement agents and the Greenfield police officers were properly carried out.

---

9. For the purposes of security and control of dangerous drugs, Ohio Adm.Code 4729–9–11, as in effect in 1987, required as follows:

"A pharmacist shall provide 'supervision and control' of dangerous drugs as required in division (B) of section 4729.55 of the Revised Code, and 'adequate safeguards' as required in division (C) of section 4729.55 of the Revised Code, by either of the following procedures:

"(A) Personal supervision by a registered pharmacist of the dangerous drug stock in a pharmacy when the dangerous drug stock is subject to theft or diversion.

"(B) *Physical security* of the dangerous drug stock, whenever personal supervision of it is not provided by a registered pharmacist, according to the following requirements:

"(1) Owners of prescription departments, which are to be closed at times the merchandise area of the same storeroom remains open, must request permission from the state board of pharmacy, submit a detailed plan of the prescription department barrier and obtain written approval before closing the prescription department.

"(2) The prescription department must be secured by a physical barrier at least seven feet high and suitable locks to prevent anyone from entering at a time the pharmacist is not present without obvious damage to the barrier of physical security provided.

"(3) The prescription department must contain all dangerous drugs, exempt narcotics, devices, poisons, and every other item or product which requires the personal supervision or sale by a pharmacist.

"(4) No item, product, record or equipment which must be accessible to anyone other than a pharmacist may be stored in the prescription department.

"(5) *Only a pharmacist or responsible person designated by the owner may possess the key to the prescription department and assume responsibility for the security of dangerous drugs, exempt narcotics, devices, poisons and any other item or product which requires the personal supervision or sale by a pharmacist.*

"(6) No prescription, dangerous drug, exempt narcotic, device, nor any other item or product which requires the personal supervision or sale by a pharmacist may be sold, given away or disposed of at any time the prescription department is closed.

"(7) New prescriptions received from the patient or by mail, refill prescription orders received from the patient or by phone or by mail may be dropped into the prescription department by slot, when a pharmacist is not present.

"(8) Notice to the public of operating hours of the prescription department must be posted." (Emphasis added.) Ohio Monthly Record (1977–1978) 3–1044.

The majority carelessly concludes in this case that "while the State Board of Pharmacy is empowered to inspect records and files pertaining to the business of a pharmacy pursuant to R.C. 3719.13 and 3719.27, the board cannot act as a surrogate for the police to obviate the constitutional duty of obtaining a search warrant." (Footnotes omitted.) The majority supports its position by citing *State v. VFW Post 3562* (1988), 37 Ohio St.3d 310, 315, 525 N.E.2d 773, 778, which held that " * * * a warrantless administrative search may not be used to obtain evidence of general criminality."

In *VFW Post 3562*, liquor agents conducted a general search, which resulted in the filing of gambling charges under R.C. 2915.02. The charges were unrelated to the liquor laws. Furthermore, in *VFW Post 3562*, the defendants challenged the constitutionality of R.C. 4301.10(A)(6) and certain Ohio Administrative Code regulations adopted by the Department of Liquor Control regarding inspections and searches. It should be noted that in the case *sub judice* there is no challenge to the constitutionality of R.C. 3719.13, 3719.27 or 4729.37. Moreover, in this case only charges relating to controlled substances, dispensing of them, or prescriptions for them were filed against the defendant. R.C. 3719.18(A) directs the State Board of Pharmacy, its officers and agents to enforce R.C. Chapters 2925 and 3719. To maintain that violations of R.C. Chapter 2925 are offenses of general criminality not related to the inspections under R.C. 3719.13, 3719.27 and 4729.37 is judicially irresponsible in light of the clear intent of these statutes. Thus, *VFW Post 3562*, *supra*, is clearly distinguishable from this case on its facts and the issues appealed from the lower appellate court.

Accordingly, for the reasons expressed above, I strongly dissent and would reinstate defendant's convictions on all counts of the indictment.

WRIGHT, J., concurs in the foregoing dissenting opinion.