[Cite as *State v. Grady*, 2025-Ohio-2734.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## LAKE COUNTY

| | |
|---|---|
| STATE OF OHIO,<br><br>Plaintiff-Appellee<br><br>- vs -<br><br>DARRAL LOVELL GRADY,<br><br>Defendant-Appellant. | CASE NO. 2024-L-089<br><br>Criminal Appeal from the<br>Court of Common Pleas<br><br>Trial Court No. 2024 CR 000127 |

## OPINION AND JUDGMENT ENTRY

Decided: August 4, 2025
Judgment: Affirmed

*Charles E. Coulson*, Lake County Prosecutor, *Kristi L. Winner* and *Jennifer A. McGee*, Assistant Prosecutors, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Vanessa R. Clapp*, Lake County Public Defender, 125 East Erie Street, Suite 50, Painesville, OH 44077 and *Paul J. Lubonovic*, Assistant Public Defender, 100 West Erie Street, Painesville, OH 44077 (For Defendant-Appellant).

JOHN J. EKLUND, J.

{¶1}    Appellant, Darral Lovell Grady, appeals the judgment of conviction from the Lake County Court of Common Pleas after his plea of no contest to one count of Having Weapons While Under Disability, one count of Improperly Handling Firearms in a Motor Vehicle, and two counts of Carrying Concealed Weapons. Appellant argues that the trial court erred by denying his Motion to Suppress the search of his vehicle for two reasons: first, because the officer conducting the search had completed the stop and unreasonably continued Appellant's detention based only on an inarticulate hunch; second, because

under the totality of the circumstances, Appellant's consent to search the vehicle was not voluntary.

{¶2} Having reviewed the record and the applicable caselaw, we find Appellant's assignment of error to be without merit. First, Appellant's brief detention beyond the scope of the officer issuing a written warning for a traffic violation was based on the officer's reasonable suspicions of criminal activity developed during his encounter with Appellant. Second, the totality of the circumstances demonstrated that Appellant voluntarily consented to the search of his vehicle, which resulted in the discovery of a firearm under the driver's seat.

{¶3} Therefore, the judgment of the Lake County Court of Common Pleas is affirmed.

**Substantive and Procedural History**

{¶4} On June 10, 2024, the Lake County Grand Jury indicted Appellant on one count of Having Weapons While Under Disability, a third-degree felony in violation of R.C. 2923.13(A)(2); one count of Improperly Handling Firearms in a Motor Vehicle, a fourth-degree felony in violation of R.C. 2923.16(B); and two counts of Carrying Concealed Weapons in violation of R.C. 2923.12(A)(2), both fourth-degree felonies. Appellant pled not guilty.

{¶5} On July 15, 2024, Appellant filed a Motion to Suppress, challenging the constitutionality of the stop of his vehicle under the Fourth Amendment. The State filed its Response to Motion to Suppress on July 29, 2024.

{¶6} The trial court held a suppression hearing on August 28, 2024. The State called one witness, Officer Ryan Thomas of the Wickliffe Police Department. The State

played Officer Thomas' dash camera and body camera videos during the hearing and introduced several photographs from the scene. The State also introduced Officer Thomas' training record. Appellant did not present any witnesses.

{¶7} Officer Thomas testified that he has been a full-time officer since January 2021. He testified as to his training and experience, including how to identify "nervous behaviors" of individuals engaged in criminal activity such as possible evasive driving maneuvers and abnormal answers to questions about possible illegal activity. Officer Thomas also identified techniques for questioning someone to aid in uncovering possible criminal activity. He testified that he was trained to ask "specific questions along the lines of the exact criminal activity" to set a baseline response where "their responses are consistent up until you ask a certain question and then their behavior or their reaction or choice of words changes from the consistency that they were giving." He said the change in consistent answers can be indicia of nervous behavior related to criminal activity.

{¶8} He also noted that there are hotels and motels along Route 90 and Euclid Avenue that have a lot of short-term vehicular and personal traffic associated with criminal activity. Officer Thomas said that the Plaza Motel is one of the known locations where law enforcement has "a lot of problems" such as drug trafficking, people with outstanding warrants, domestic violence, and disorderly conduct. Officer Thomas said that he has been involved in several drug arrests at that location.

{¶9} Officer Thomas testified that he was on duty on January 23, 2024, monitoring traffic on Euclid Avenue at 11:44 p.m. He said that he saw a Ford Edge that caught his attention. He began to follow the vehicle and watched as the driver attempted to pull into a parking lot. However, the entrance to the lot was closed due to construction.

Case No. 2024-L-089

When the driver was unable to enter the parking lot, the driver began to travel in the wrong lane of the road before entering the other entrance of the lot. At this point, Officer Thomas initiated a traffic stop.

{¶10} Officer Thomas approached the vehicle and identified Appellant and one female passenger. Appellant explained that he had become confused about finding the entrance to the parking lot he was looking for. He said that he was trying to go to the Plaza Motel to pick up a friend and bring him to another motel in Euclid, Ohio. Officer Thomas testified that this sort of behavior is associated with criminal activity.

{¶11} Officer Thomas asked Appellant whether a dog would alert to any drugs in the car. Instead of saying no, Appellant asked where the dog was. Officer Thomas explained there was not a dog at the scene, and appellant then said a dog would not alert. Officer Thomas found this response "odd," and he testified that he began to suspect Appellant was involved in criminal activity.

{¶12} Officer Thomas also asked a series of questions about whether there were firearms or contraband in the vehicle. Appellant and the passenger said "no" to each question until Officer Thomas asked about the presence of fentanyl. The passenger did not answer this question and instead turned toward Appellant and looked at him. Officer Thomas said that this variation in response to a series of specific questions heightened his suspicions. At this point in the encounter, he believed there was "some type of criminal activity that was afoot within the vehicle."

{¶13} Officer Thomas told Appellant that he was going to issue him a written warning for the traffic violation and returned to his cruiser to fill out the form. While he was doing this, Officer Dodds arrived to provide assistance. Officer Thomas told Officer Dodds

Case No. 2024-L-089

that he had given Appellant his "whole spiel" and that he was going to get Appellant out of the vehicle to see if he could "get anything else weird" out of him. Officer Thomas testified that he was referring to any additional abnormal behavior in addition to what he had already observed.

{¶14}  Officer Thomas had Appellant step out of the vehicle and explained the written warning to him. On cross-examination, Officer Thomas acknowledged that when he handed Appellant the written warning, that completed the purpose of the stop, which was originally for a traffic violation. After handing Appellant the warning, Officer Thomas asked Appellant several questions about the friend he was planning to meet at the Plaza Motel. Officer Thomas cautioned Appellant that the Plaza Motel is known for criminal activity and urged him to exercise care. Officer Thomas then asked Appellant whether he had any marijuana in the car. Appellant nodded his head "yes" but verbally stated "no." Officer Thomas found this indicative of possible criminal activity. Officer Thomas also asked Appellant if there was any fentanyl in the car. Instead of saying "no," Appellant asked what fentanyl was. Officer Thomas then asked Appellant, "Would you mind if I checked your car?" Appellant said, "Go ahead." Officer Thomas had not searched, touched, handcuffed, or otherwise restrained Appellant up to this point.

{¶15}  Officer Thomas searched the vehicle and found a loaded handgun underneath the driver's side of the vehicle and drug paraphernalia in a bag that belonged to the passenger. Officer Thomas placed Appellant under arrest and Mirandized him. Appellant admitted that the firearm was his and that he was under a disability.

{¶16}  On September 9, 2024, the trial court issued a judgment entry denying Appellant's Motion to Suppress. The trial court summarized the testimony and evidence

from the hearing and found Officer Thomas' testimony to be credible. The trial court determined that the investigative stop was constitutional because Officer Thomas observed a marked lanes violation. The trial court further determined that during that valid investigative stop, Officer Thomas

> encountered additional specific and articulable facts giving rise to suspicion of drug activity: According to Off. Thomas Euclid Avenue in general, and the Plaza Motel in particular, has frequent drug activity, and short stays at and/or visits to the Plaza Motel are indicative of drug activity. Here it was nearly midnight, and [Appellant] told the officer that he was going to the Plaza Motel to pick up a friend. When Off. Thomas asked about particular drugs in the vehicle, [Appellant] and his passenger answered no to each one – except for fentanyl, where [Appellant] answered no and the passenger did not answer but instead just gave [Appellant] a look, The court finds that these facts taken together gave Off. Thomas reasonable suspicion to extend the stop after he gave [Appellant] the written warning for the traffic violation.

{¶17} The trial court also noted that Appellant did not testify, and therefore the only basis to establish the involuntary nature of the search was from Officer Thomas' testimony and the video from the scene. The trial court found that the video of the traffic stop supported the conclusion that Appellant voluntarily gave consent to search the vehicle because Officer Thomas was four to six feet away from Appellant, was not blocking his path to the vehicle, and never touched Appellant. Further, Appellant never indicated he wanted to leave, and Officer Thomas never prevented him from leaving.

{¶18} On September 13, 2024, Appellant pled no contest to each of the counts in the indictment.

{¶19} On November 13, 2024, the trial court sentenced Appellant to three years of community control on each count, to be served concurrently with each other after serving 90 days jail with credit for 47 days served, as well as other conditions.

{¶20} Appellant timely appealed raising one assignment of error.

Case No. 2024-L-089

**Assignment of Error and Analysis**

{¶21} Appellant's sole assignment of error states: "THE TRIAL COURT ERRED WHEN IT DENIED DEFENDANT-APPELLANT'S MOTION TO SUPPRESS. (Dkt. 60)."

{¶22} Primarily relying on *State v. Robinette*, 1997-Ohio-343 (*Robinette III*), Appellant has presented two issues for review under his broad assignment of error. First, he argues that Officer Thomas lacked reasonable suspicion to continue Appellant's detention after Officer Thomas had completed the mission of the stop and that his continued detention was based on an inarticulate hunch of criminal activity. The second issue Appellant argues is that, under the totality of the circumstances, he was compelled to give consent to search the vehicle and did not voluntarily give his consent. He asserts that he was illegally detained when Officer Thomas asked for consent to search the vehicle and Appellant was merely submitting to lawful authority and not giving voluntary consent.

**General Principles:**

{¶23} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 2003-Ohio-5372, ¶ 8. At a hearing on a motion to suppress, the trial court, as the trier of fact, is in the best position to weigh the evidence by resolving factual questions and evaluating the credibility of witnesses. *Id.*; *State v. Mills*, 62 Ohio St.3d 357, 366 (1992). As a result, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. *Id.* An appellate court reviews the trial court's application of the law to its factual findings de novo. *State v. Belton*, 2016-Ohio-1581, ¶ 100. Accepting the facts as true, the reviewing court then must

Case No. 2024-L-089

independently determine, without deference to the trial court, whether the trial court properly applied the substantive law to the facts of the case. *Burnside* at ¶ 8.

{¶24} The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const., amend. IV. The language of Article I, Section 14 of the Ohio Constitution is virtually identical and affords the same protections. *State v. Hoffman*, 2014-Ohio-4795, ¶ 11. "The touchstone of both is reasonableness." *State v. Brown*, 2020-Ohio-5140, ¶ 8 (11th Dist.).

{¶25} "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." (Footnote omitted.) *Katz v. United States*, 389 U.S. 347, 357 (1967). "When a defendant moves to suppress evidence recovered during a warrantless search, the state has the burden of showing that the search fits within one of the defined exceptions to the Fourth Amendment's warrant requirement." *State v. Banks-Harvey*, 2018-Ohio-201, ¶ 18.

{¶26} "Courts must exclude evidence obtained by searches and seizures that violate the Fourth Amendment." *State v. Adams*, 2015-Ohio-3954, ¶ 181, citing *Mapp v. Ohio*, 367 U.S. 643 (1961) (extending the exclusionary rule to the states). "'The primary purpose of the exclusionary rule is to remove incentive from the police to violate the Fourth Amendment.'" *State v. Eggleston*, 2015-Ohio-958, ¶ 17 (11th Dist.), quoting *State v. Casey*, 2014-Ohio-2586, ¶ 29 (12th Dist.).

{¶27} The constitutionality of a traffic stop should be assessed in a manner similar to that of a brief detention under *Terry v. Ohio*, 392 U.S. 1 (1968), rather than a formal

Case No. 2024-L-089

arrest. *State v. Dunlap*, 2024-Ohio-4821, ¶ 16. "[P]ursuant to *Terry* . . . a police officer may, under limited circumstances, detain an individual and conduct a brief investigative stop." *State v. Gray*, 2000 WL 973411, *2 (11th Dist. July 14, 2000). As with a *Terry* stop, to initiate or continue a traffic stop, an officer must have a reasonable articulable suspicion of criminal activity based on "articulable facts that give rise to a reasonable suspicion that the individual is currently engaged in or is about to engage in criminal activity." *Id.*

{¶28} The Supreme Court has held that whether an officer had a reasonable suspicion to justify the investigative stop "must be viewed in light of the totality of the surrounding circumstances." *State v. Bobo*, 37 Ohio St.3d 177 (1988), paragraph one of the syllabus. It is not possible to precisely define the reasonable suspicion necessary to initiate a stop, and the standard cannot be "reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983); *Maumee v. Weisner*, 1999-Ohio-68, ¶ 14. Reasonable suspicion is less than probable cause but "something more than an 'inchoate and unparticularized suspicion or "hunch."'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989), quoting *Terry* at 27. Relevant factors in determining whether an officer possessed reasonable suspicion include: the location of the stop being in a high crime area, whether the officer was aware of recent criminal activity in the area, the time of the stop, suspicious conduct, and the officer's training and experience. *State v. Freeman*, 64 Ohio St.2d 291, 295 (1980).

{¶29} Once an officer has initiated a lawful traffic stop based on reasonable suspicion, the officer may not extend the scope of the stop beyond the initial "'mission'" of the seizure. *Rodriguez v. United States*, 575 U.S. 348, 354-355 (2015). This typically means that an officer may only delay a motorist for the time necessary to issue a ticket

or a warning. *State v. Batchili*, 2007-Ohio-2204, ¶ 12. "Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.'" *Rodriguez* at 355, quoting *Illinois v. Caballes*, 543 U.S. 405, 408 (2005). "Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* An officer taking actions outside of this mission would render a traffic stop unlawful if the "'unrelated inquiries . . . measurably extend the duration of the stop.'" *Id.*, quoting *Arizona v. Johnson*, 555 U.S. 323, 333 (2009). Courts consider the totality of the circumstances when considering whether an officer diligently completed the original purpose of the stop within a reasonable length of time. *Batchili* at ¶ 12.

{¶30} However, an officer may extend the duration of a traffic stop where the officer obtains additional facts that give rise to a reasonable articulable suspicion of criminal activity warranting additional investigation. *Robinette III*, 1997-Ohio-343, at ¶ 27. The order to step out of the vehicle requires no constitutional quantum of suspicion. *State v. Evans*, 67 Ohio St.3d 405, 408 (1993). "[T]he circumstances surrounding the stop must 'be viewed through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training.'" *Bobo*, 37 Ohio St.3d at 179, quoting *United States v. Hall*, 525 F.2d 857, 859 (D.C.Cir. 1976). Whether the continued seizure was reasonable is analyzed under the totality of the circumstances. *Robinette III* at ¶ 30.

**Reasonable suspicion to extend the scope of the detention:**

{¶31} First, Appellant's argument that Officer Thomas lacked reasonable suspicion to continue Appellant's detention after Officer Thomas had issued Appellant his warning is not well taken.

{¶32} In *Robinette III*, the officer stopped the defendant for speeding. Before approaching the offender's vehicle, the officer already decided to issue only a verbal warning. *Id.* at ¶ 1. He approached and requested the defendant's license (which was produced) and, returning to his vehicle, checked the defendant for violations, and found none. *Id.* Returning to the defendant, the officer still had no intention of issuing a ticket and no suspicions of any criminal activity had been aroused. *Id.*

{¶33} Nevertheless, the officer asked the defendant to step out of the car and step to the rear of his vehicle; he complied. *Id.* The officer activated his cruiser's video camera, returned to the defendant, issued the verbal warning for speeding, and returned his driver's license. *Id.* After doing this, the officer asked the defendant if he was carrying any contraband like weapons or drugs. *Id.* The defendant said "no," and the officer then asked if he could search the vehicle. *Id.* The defendant testified at a suppression hearing "that he was shocked at the question and 'automatically' answered 'yes,'" saying that he did not believe he was free to refuse the request. *Id.* The officer conducted a search and found an MDMA pill. *Id.*

{¶34} Once the officer issued the warning, "the reason for the stop ended." *Id.* at ¶ 17. At that time, the Supreme Court's opinion reflects no additional facts the officer obtained other than that the defendant had a violation-free license and had complied with the officer's requests. The only reason the officer continued his detention by asking another question and conducting a search was pursuant to the sheriff department's drug interdiction policy, which required officers to ask persons detained during a traffic stop whether there was any contraband in the vehicle and then to ask for consent to search the vehicle. *Id.* at ¶ 18.

Case No. 2024-L-089

{¶35}   In *Robinette III*, the officer had no reasonable articulable suspicion on which to extend the scope of the stop. *Id.* at ¶ 26-29. The Supreme Court of Ohio indicated that there was not even a minimal suspicion of criminal activity. *Id.* The arresting officer decided to only issue a warning to the defendant, and none of the questions that he asked the defendant raised his suspicions of criminal activity. *Id.* Indeed, the officer indicated that the only basis he had to continue to detention after issuing the verbal warning was based on department drug interdiction policy and not based on any articulable facts derived from the interaction. *Id.* at ¶ 18.

{¶36}   The Ohio Supreme Court noted that as long as there is an objective basis to continue a detention, "the Fourth Amendment is not offended." *Id.* at ¶ 19. The Court held that the officer's minimal intrusion of simple questioning of a person not in custody did not constitute a seizure requiring Fourth Amendment protection. *Id.* at ¶ 25, citing *Florida v. Royer*, 460 U.S. 491, 497 (1983). In certain circumstances, brief detention without the presence of reasonably articulable facts of criminal activity to ask whether a suspect is carrying any illegal drugs or weapons pursuant to a department's drug interdiction policy can be permissible under the Fourth Amendment because "such a policy promotes the public interest in quelling the drug trade." *Id.* at ¶ 25.

{¶37}   However, the Court in *Robinette III* concluded that upon asking these questions, the officer had not ascertained reasonable articulable facts that gave rise to a suspicion of criminal activity that justified further detention of the defendant. *Id.* at ¶ 26-29.

{¶38}   This differs significantly from the case before us because Officer Thomas articulated specific facts on which he became suspicious that Appellant was engaged in

criminal activity. Late in the evening, Officer Thomas observed a traffic violation and appropriately engaged with Appellant to issue him a written warning. During the course of that initial encounter, Officer Thomas asked Appellant and his passenger several questions. Appellant said that he was going to the Plaza Motel, a location known to Officer Thomas as a frequent location for drug and other criminal activity. At the suppression hearing, Officer Thomas identified the Plaza Motel specifically as a location known for short-term traffic and criminal activity and said he had been involved in arrests at that location. Further, Appellant said that he was going to the motel to pick up a friend and bring him to another motel in Euclid, Ohio. Officer Thomas also identified that criminal activity had been associated with short term traffic at several hotels and motels along Euclid Avenue near Route 90.

{¶39}   In addition to these details, Officer Thomas also asked a series of questions about contraband located in the vehicle during his initial encounter with Appellant. Although Appellant and the passenger denied possessing other contraband, when Officer Thomas asked about the presence of fentanyl specifically, he noted that the passenger changed her pattern of response and "looked" at Appellant but did not answer the question. Officer Thomas also asked if a drug-sniffing dog would alert on the vehicle. Rather than answering "no," Appellant instead asked where the dog was. It was only when Officer Thomas said no dog was present that Appellant said the dog would not alert.

{¶40}   Officer Thomas then went to fill out the written traffic warning. While he was doing this, Officer Dodds came to the scene for backup. Officer Thomas told Officer Dodds that he wanted to get Appellant out of the car to see if he could "get anything else weird" out of him. Getting Appellant out of the car required no quantum of constitutional

Case No. 2024-L-089

suspicion. *See Evans*, 67 Ohio St.3d at 408. Officer Thomas ordered Appellant out of the vehicle to issue him the written warning and to ask additional questions about his activity. After getting Appellant out of the vehicle, but before asking for consent to search the vehicle, Officer Thomas advised appellant to be careful while he was at the Plaza Motel due to criminal activity at that location.

{¶41}   Although Officer Thomas had completed the initial mission of the traffic stop when he gave Appellant the written warning, Officer Thomas had developed a reasonable articulable suspicion of criminal activity that justified a brief continued detention and the follow-up questions that he asked appellant outside of his car. The additional questions Officer Thomas asked were part of a permissible brief detention based on his suspicions of criminal activity in which Appellant was engaged or was about to be engaged. The brief detention beyond the scope of issuing the written warning was well justified and based on Officer Thomas' reasonable suspicions of criminal activity. Therefore, Appellant's brief continued detention did not offend the Fourth Amendment.

**Voluntariness of consent to search:**

{¶42}   Second, Appellant voluntarily consented to the search his vehicle. Again, this case is unlike *Robinette III*, because in *Robinette III* the officer asked for consent to search based on a department interdiction policy despite not having any articulable facts on which to justify the continued detention. In other words, the officer's continuing questioning and request for consent to search the vehicle constituted an unlawful detention that undercut the defendant's exercise of his independent free will. *See Robinette III* at ¶ 40.

Case No. 2024-L-089

{¶43} Under the totality of the circumstances, a defendant may give voluntary consent to a search, even where no reasonable articulable suspicion of criminal activity exists. *Id.* at ¶ 30. "A search based on consent is one exception to the Fourth Amendment's general warrant requirement." *State v. Ferrell*, 2017-Ohio-9341, ¶ 12 (11th Dist.); see *State v. Penn*, 61 Ohio St.3d 720, 723 (1991). "Appellate review of the voluntariness of consent to search is 'limited to a determination of whether the trial court's decision was "clearly erroneous,"' and an appellate court must 'accept the trial court's findings of facts and determinations regarding credibility if they are supported by competent, credible evidence.'" *Bainbridge v. Kaseda*, 2008-Ohio-2136, ¶ 27 (11th Dist.), quoting *State v. Samples*, 1994 WL 315710, *2 (11th Dist. June 24, 1994).

{¶44} "In order to waive his Fourth Amendment privilege against unreasonable searches and seizures, the accused must give a consent which is voluntary under the totality of all the surrounding circumstances." *State v. Childress*, 4 Ohio St.3d 217 (1983), paragraph one of the syllabus. A third party may validly give consent, but the third-party must possess "common authority over the area sought to be searched." *State v. Miller*, 117 Ohio App.3d 750, 759 (11th Dist. 1997), citing *United States v. Matlock*, 415 U.S. 164, 171 (1974).

{¶45} "[E]very search situation is unique unto itself and no set of fixed rules will be sufficient to cover every situation." *Robinette III* at ¶ 32.

> "[W]hen the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to

demonstrate such knowledge as a prerequisite to establishing a voluntary consent."

*Id.* at ¶ 33, quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 248-249 (1973).

{¶46}  "When an individual is lawfully detained by police and consents to a search, the state must demonstrate by clear and convincing evidence that consent was freely and voluntarily given." *State v. Clark*, 2024-Ohio-1869, ¶ 14 (10th Dist.); *see Royer*, 460 U.S. at 497 ("the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority"). "Important factors for the trial court to consider in determining whether a consent was voluntary include the following: (1) the suspect[']s custodial status and the length of the initial detention; (2) whether the consent was given in public or at a police station; (3) the presence of threats, promises, or coercive police procedures; (4) the words and conduct of the suspect; (5) the extent and level of the suspect[']s cooperation with the police; (6) the suspect[']s awareness of his right to refuse to consent and his status as a 'newcomer to the law'; and (7) the suspect[']s education and intelligence." *State v. Riggins*, 2004-Ohio-4247, ¶ 15 (1st Dist.), citing *Schneckloth* at 248-249; *State v. Lett,* 2009-Ohio-2796, ¶ 33 (11th Dist.) (adopting *Riggins*).

{¶47}  In *Robinette III*, the Supreme Court of Ohio said that the "timing of . . . [the] immediate transition from giving . . . the warning for speeding into questioning regarding contraband and the request to search is troubling." *Id*. at ¶ 37. The Court elaborated that "'[t]he transition between detention and a consensual exchange can be so seamless that the untrained eye may not notice that it has occurred. The undetectability of that transition may be used by police officers to coerce citizens into answering questions that they need

Case No. 2024-L-089

not answer, or to allow a search of a vehicle that they are not legally obligated to allow." *Id.,* quoting *State v. Robinette*, 1995-Ohio-162, ¶ 19. Thus, despite the officer's questioning not being "expressly coercive" the Court determined that "the circumstances surrounding the request to search made the questioning impliedly coercive." *Id.* at ¶ 38. "Once an individual has been unlawfully detained by law enforcement, for his or her consent to be considered an independent act of free will, the totality of the circumstances must clearly demonstrate that a reasonable person would believe that he or she had the freedom to refuse to answer further questions and could in fact leave." *Id.* at ¶ 40.

{¶48} The officer in *Robinette III* had completed the mission of his stop and had no reasonable articulable suspicion on which to continue the detention. However, the Supreme Court of Ohio also addressed whether the officer had nevertheless received voluntary consent to conduct a search. *Id.* at ¶ 30.

{¶49} The Supreme Court of Ohio found it significant that the officer gave the defendant a warning "*[b]ut without any break in the conversation*" asked the defendant if the defendant had any contraband in the car and asked for consent to search the car. (Emphasis in original.) *Id.* at ¶ 35. The defendant "hesitated, looked at his car, then back at the officer, then nodded his head," and the officer commenced a search. *Id.* The officer subjecting the defendant to additional questions did not give the defendant the impression that he was free to go until he answered those additional questions, and the transition from issuing the warning for speeding into a consensual exchange was so seamless as to be unnoticeable. *Id.* at ¶ 37. These factors, combined with the officer's "superior position of authority," indicated that a reasonable person would have felt compelled to submit to the officer's questioning and that the defendant "merely submitted to 'a claim of

lawful authority' rather than consenting as a voluntary act of free will." *Id.* at ¶ 38, quoting *Royer*, 460 U.S. at 497.

{¶50} Here, however, Officer Thomas had a reasonable articulable suspicion of criminal activity that justified his detention of Appellant beyond issuing the written warning. It was in the context of this legal detention and extension of the mission of the stop that Officer Thomas requested that Appellant consent to the search of his vehicle. This distinguishes the present matter from the additional concerns the Ohio Supreme Court identified in *Robinette III.* Applying the factors to consider in determining whether consent was voluntary, the totality of the circumstances demonstrated that Appellant voluntarily consented to the search. *See Riggins*, 2004-Ohio-4247, at ¶ 15 (1st Dist.). Appellant was not in police custody and had only been briefly detained by Officer Thomas to issue him a written warning. During that brief detention, Officer Thomas developed a reasonable articulable suspicion of criminal activity and inquired of Appellant further. This all occurred in a public setting, and Officer Thomas never touched Appellant and did not place him in his police cruiser. Officer Thomas was standing four to six feet away from Appellant and did not block his path to his vehicle. Appellant's words and conduct as captured on the videos in evidence did not indicate that Appellant was coerced, confused, or under duress. Officer Thomas made no threats or promises and took no coercive action. The trial court's determination that Appellant voluntarily consented to the search of his vehicle based on the totality of the circumstances was not clearly erroneous.

{¶51} Accordingly, Appellant's sole assignment of error is without merit.

{¶52} For the foregoing reasons, the judgment of the Lake County Court of Common Pleas is affirmed.


ROBERT J. PATTON, P.J.,

MATT LYNCH, J.,

concur.

# JUDGMENT ENTRY

For the reasons stated in the opinion of this court, Appellant's assignment of error is without merit. It is the judgment and order of this court that the judgment of the Lake County Court of Common Pleas is affirmed.

Costs to be taxed against Appellant.

_____
JUDGE JOHN J. EKLUND

_____
PRESIDING JUDGE ROBERT J. PATTON,
concurs

_____
JUDGE MATT LYNCH,
concurs

---

**THIS DOCUMENT CONSTITUTES A FINAL JUDGMENT ENTRY**

A certified copy of this opinion and judgment entry shall constitute the mandate pursuant to Rule 27 of the Ohio Rules of Appellate Procedure.

---

Case No. 2024-L-089