[Cite as *State v. Brown*, 2020-Ohio-5140.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# LAKE COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, LAKE COUNTY HUMANE SOCIETY, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NOS. 2020-L-002** **2020-L-003** |
| TOM BROWN, et al., | : | |
| Defendants-Appellants. | : | |

Criminal Appeals from the Painesville Municipal Court, Case Nos. 2017 CRB 00318 and 2017 CRB 00319.

Judgment: Affirmed.

*J. Jeffrey Holland*, Holland and Muirden, 1343 Sharon-Copley Road, P.O. Box 345, Sharon Center, Ohio 44274 (For Plaintiff-Appellee).

*Michela J. Huth*, P.O. Box 17, Bolivar, Ohio 44612 (For Defendants-Appellants).

THOMAS R. WRIGHT, J.

{¶1} Appellants, Tom Brown and Judith Brown, appeal the decision denying their motion to suppress and finding them in violation of community control. We affirm.

{¶2} Tom and Judith Brown are the owners of Caroline's Kids Pet Rescue, a cat rescue shelter in Concord, Ohio. In 2018, we affirmed their 24 convictions of cruelty against companion animals. *State v. Wolford-Lee*, 11th Dist. Lake No. 2017-L-122, 2018-Ohio-5064, *appeal not allowed,* 155 Ohio St.3d 1421, 2019-Ohio-1421, 120 N.E.3d 868.

They were both sentenced to 90 days on each count, suspended; fined $500 on each count, suspended; and ordered to serve 36 months of community control.

{¶3} After an inspection in September 2019, appellee, the Lake County Humane Society (LCHS), alleged the Browns had three community control violations. The Browns moved to suppress all evidence from the inspection. The trial court overruled the motion to suppress and found the Browns committed three community control violations. The trial court did not revoke their community control but extended the length to five years and imposed stricter terms.

{¶4} The Browns raise five assignments of error, which we address out of order. Their second and third assignments assert:

{¶5} "[2] The Trial Court abused its discretion when it denied Appellants' Motion to Suppress the evidence.

{¶6} "[3] Lake Humane Society violated Appellant's Fourth Amendment rights when it entered the front door of Caroline's Kids."

{¶7} The Browns first allege that the LCHS lacked reasonable articulable suspicion to conduct a search of the shelter, and as such, suppression was warranted. Second, they contend that even if LCHS had consent to enter, their initial entry into the vestibule of the structure nevertheless violated their Fourth Amendment rights because the LCHS did not have permission to enter this part of the building. We disagree with both arguments.

{¶8} The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures * * *." Fourth Amendment, United States

2

Constitution. The Ohio Constitution likewise protects against arbitrary government invasions. *State v. Hoffman*, 141 Ohio St.3d 428, 2014-Ohio-4795, 25 N.E.3d 993, ¶ 11, citing *State v. Robinette*, 80 Ohio St.3d 234, 685 N.E.2d 762 (1997). The touchstone of both is reasonableness. *State v. Michael,* 2013-Ohio-3889, 995 N.E.2d 286, ¶ 10 (10th Dist.).

{¶9} "'[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" (Footnote omitted.) *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

{¶10} "When a defendant moves to suppress evidence recovered during a warrantless search, the state has the burden of showing that the search fits within one of the defined exceptions to the Fourth Amendment's warrant requirement. *Athens v. Wolf*, 38 Ohio St.2d 237, 241, 313 N.E.2d 405 (1974)." *State v. Banks-Harvey*, 152 Ohio St.3d 368, 2018-Ohio-201, 96 N.E.3d 262, ¶ 17-18.

{¶11} "A search based on consent is one exception to the Fourth Amendment's general warrant requirement. *State v. Robinette*, 80 Ohio St.3d 234, 243, 685 N.E.2d 762 (1997). When the state seeks to rely upon consent to justify a search, it has the burden of establishing that the consent was voluntary and freely given. *Id.* 'The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of "objective" reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?' (Citations omitted.) *Florida v. Jimeno*, 500 U.S. 248, 250–51, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991)." *State v. Ferrell*, 91 N.E.3d 766, ¶ 12-13 (11th Dist.).

{¶12} "[V]alid consent can be given by one other than a defendant if the third party granting such consent possessed common authority over or other sufficient relationship to the premises sought to be searched." *State v. Gibson*, 164 Ohio App.3d 558, 2005-Ohio-6380, 843 N.E.2d 224, ¶ 16 (4th Dist.), citing *U.S. v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).

{¶13} Moreover, when consent to a search is given, probable cause to conduct a search is not required. *State v. Crawford*, 14 Ohio App.2d 41, 43, 236 N.E.2d 214, 215 (1st Dist.1968); *State v. Gibson*, 164 Ohio App.3d 558, 2005-Ohio-6380, 843 N.E.2d 224, ¶ 16 (4th Dist.), citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

{¶14} Appellate courts review rulings on a motion to suppress under a mixed standard of review. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. "[T]he trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *Id.* We must accept the trial court's findings of fact if they are supported by competent, credible evidence, and then independently decide whether those facts satisfy the applicable legal standards without deference to the trial court's decision. *Id.*

{¶15} Here, the Browns' terms of community control authorized random inspections of animal shelters owned and operated by them by a veterinarian agreed upon in advance by both parties. The parties disagree as to whether there was an agreed upon veterinarian authorized to inspect in September 2019.

{¶16} Megan Newkirk, a veterinarian assistant, testified for LCHS. Newkirk is an employee of LCHS and was present during the September 3, 2019 inspection of the

4

shelter referred to as Caroline's Kids. Newkirk and Dr. Amy Wolfgang, a veterinarian, arrived at the shelter to conduct the inspection.

{¶17} Newkirk recalled that the shelter has an outside door and an inside door. She said she knocked on the outside door before entering. Virginia Lee answered the door. Newkirk told Lee that they were there for a random inspection. Lee let Newkirk and Wolfgang inside. Newkirk knew Lee and believed she had the authority to let them inside because Lee "helped run the place."

{¶18} Newkirk relayed the following on direct:

{¶19} "A. She [Lee] opened the door when we all arrived and said she was going to call Judie [the owner]. So we said okay and gave her five minutes, and then we re-knocked and she opened the door, and we went in.

{¶20} "* * *

{¶21} "Q. Did she step aside to allow you in?

{¶22} "A. Yes.

{¶23} "Q. Did she step aside and make room for you to get in?

{¶24} "A. Yes.

{¶25} "Q. Did you feel that you were invited in at that point?

{¶26} "A. Yes."

{¶27} There was no objection to Newkirk and Wolfgang entering on the day of the inspection. Once inside, however, Lee relayed that there was an issue with Wolfgang being there. While inside, the LCHS attorney told Newkirk that Wolfgang was not supposed to be there, so Wolfgang left. Newkirk was not asked to leave.

{¶28} On cross-examination Newkirk explained that she thought Wolfgang was an approved veterinarian under the Browns' probation terms because Wolfgang was on the property and involved with inspecting it in 2018 without dispute by the Browns.

{¶29} During a prior inspection in 2018, Newkirk recalls finding several violations, including the Browns caring for too many animals in excess of the terms of their community control. There were 110 animals in the structure in 2018, but LCHS did not pursue a violation in 2018 because the parties worked together to resolve the issues. LCHS took several of the sick animals and provided educational resources to the Browns to aid them in caring for the animals.

{¶30} Danamarie Pannella, an attorney for LCHS, also testified. On the day of the September 2019 inspection, the Browns' attorney contacted her and was objecting to Wolfgang's presence at the shelter because the Browns do not trust her. The two attorneys agreed that Wolfgang would leave and the remaining LCHS representatives could stay. Pannella recalls that the Browns' lawyer instructed her not to count the cats located in the front room because these cats were in a room leased to another entity called Purrfect Partners. Pannella advised the Browns' lawyer that it is the court's decision whether these cats would be counted for community control violation purposes.

{¶31} The defense called Cassandra Hatch, a LCHS humane agent-in-training. Hatch testified that she was with Newkirk and Wolfgang on the date of the inspection and that they knocked on the outer door first, but there was no answer. They then entered the vestibule and rang the doorbell that was adjacent to the inner door. Hatch said the doorbell is visible from the outside of the building, and she recalls seeing a sign advising visitors to use the doorbell.

{¶32} Virginia Lee, a shelter volunteer, testified that she was present during the September 3, 2019 inspection, and she does not recall the LCHS representatives knocking on the outside door before they entered the vestibule. When Lee answered the door, they told her they "needed to come in and inspect the cats."

{¶33} The trial court overruled the motion to suppress finding that the search complied with the terms of the Browns' probation order and alternatively that the search was consensual.

{¶34} "'The standard for measuring the scope of * * * consent under the Fourth Amendment is that of "objective" reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?' (Citations omitted.) *Florida v. Jimeno*, 500 U.S. 248, 250-51, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991)." *State v. Ferrell*, 2017-Ohio-9341, 91 N.E.3d 766, ¶ 13 (11th Dist.).

{¶35} Here, both Newkirk and Hatch recalled knocking on the outside door before entering the vestibule to ring the doorbell. Hatch recalls seeing a sign advising people to use the doorbell. The doorbell is visible from the outside. Once Lee answered the door, she did not tell the LCHS representatives to leave, but contacted Judith and eventually returned and allowed them to enter. Once inside, they were advised that Wolfgang was not welcome, so she left. The others, Newkirk and Hatch, were allowed to stay.

{¶36} Based on these facts, the typical reasonable person would have understood that the LCHS representatives were permitted to enter and inspect the premises based on Lee's conduct. Their directive excluding Wolfgang while allowing the others to remain inside conveys they were present with consent.

{¶37} We also find that their initial entrance into the vestibule area of the building was permissible based on the sign instructing visitors to use the doorbell that was inside this part of the structure. There was no evidence to the contrary.

{¶38} Accordingly, we agree with the trial court's conclusion that the LCHS representatives entered the shelter and remained for the duration with consent. Thus, we need not address whether the search complied with the Browns' community control terms or their argument that the LCHS lacked reasonable articulable suspicion to search the shelter.

{¶39} The Browns' second and third assigned errors lack merit and are overruled.

{¶40} The Browns' first assigned error contends:

{¶41} "[1.] The Trial Court abused its discretion when it barred Dr. Phillip M. Price from testifying as an expert."

{¶42} We review a trial court's evidentiary rulings for an abuse of discretion since trial courts have broad discretion in admitting and excluding evidence. *Guliano v. Guliano*, 11th Dist. Trumbull No. 2010-T-0031, 2011-Ohio-6853, ¶ 18, citing *State v. Hymore,* 9 Ohio St.2d 122, 128, 224 N.E.2d 126 (1967).

{¶43} "'[T]he term abuse of discretion' is one of art, connoting judgment exercised by a court, which does not comport with reason or the record.' *State v. Underwood,* 11th Dist. No. 2008-L-113, 2009-Ohio-2089, 2009 WL 1177050, ¶ 30, citing *State v. Ferranto,* 112 Ohio St. 667, 676–678, 148 N.E. 362 (1925). * * * [A]n abuse of discretion is the trial court's 'failure to exercise sound, reasonable, and legal decision-making.' *State v. Beechler,* 2d Dist. Clark No. 09-CA-54, 2010-Ohio-1900, 2010 WL 1731784, ¶ 62, quoting Black's Law Dictionary (8 Ed.Rev.2004) 11. When an

8

appellate court is reviewing a pure issue of law, 'the mere fact that the reviewing court would decide the issue differently is enough to find error (of course, not all errors are reversible. Some are harmless; others are not preserved for appellate review). By contrast, where the issue on review has been confined to the discretion of the trial court, the mere fact that the reviewing court would have reached a different result is not enough, without more, to find error.' *Id.* at ¶ 67." *Ivancic v. Enos*, 2012-Ohio-3639, 978 N.E.2d 927, ¶ 70 (11th Dist.).

{¶44} The Browns argue that Crim.R. 16 did not apply to their community control revocation proceeding since it is not a criminal proceeding, and even if it did apply, the rule did not require the exclusion of Dr. Price's testimony since Crim.R. 16(K) governs trials, not revocation hearings.

{¶45} The LCHS, however, contends that the Browns invoked Crim.R. 16 when they made a Crim.R. 16 discovery request, and consequently the trial court's application of the rule was invited by the Browns. The Browns do not dispute that they made a Crim.R. 16 discovery request or that the court ordered them to comply with Crim.R. 16.

{¶46} Because a community control revocation hearing is not a criminal proceeding, the rules of criminal procedure and Crim. R. 16 generally do not apply to revocation hearings. *State v. Griffeth*, 5th Dist. Richland No. 10-CA-115, 2011-Ohio-4426, ¶ 37, citing *State v. Parsons*, 2nd Dist. Greene No. 96 CA 20, 1996 WL 665004, *10; accord *State v. Shuman*, 5th Dist. Stark No. 2009CA00271, 2010-Ohio-3957, ¶ 22.

{¶47} And as argued by the Browns, a plain reading of Crim.R. 16(K) confirms that it governs trials:

9

{¶48} "(K) Expert Witnesses; Reports. An expert witness for either side shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications. The written report and summary of qualifications shall be subject to disclosure under this rule no later than twenty-one days prior to trial, which period may be modified by the court for good cause shown, which does not prejudice any other party. Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial."

{¶49} Notwithstanding, Crim.R. 16(A) states:

{¶50} "(A) Purpose, Scope and Reciprocity. This rule is to provide all parties in a criminal case with the information necessary for a full and fair adjudication of the facts, to protect the integrity of the justice system and the rights of defendants, and to protect the well-being of witnesses, victims, and society at large. All duties and remedies are subject to a standard of due diligence, apply to the defense and the prosecution equally, and are intended to be reciprocal. Once discovery is initiated by demand of the defendant, all parties have a continuing duty to supplement their disclosures."

{¶51} The prosecutor twice raised this issue on the first day of the revocation hearing at the beginning and at the conclusion when the parties were scheduling a date to continue presenting evidence:

{¶52} "[PROSECUTOR]: Your Honor, if I may? There is an issue, I guess, that we have to talk about is that [defense counsel] did file a Criminal Rule 16 request for discovery, which is why I brought witnesses that might be presented and evidence and so forth. The State of Ohio inquired * * * [, and w]e received no response from [defense

10

counsel], so we were presuming that there will be no evidence other than the things that have already been identified by the state."

{¶53} Later that same day, the prosecutor again raised this issue:

{¶54} "[PROSECUTOR]: * * * There have been some discussions about some witnesses and some evidence and so forth that [defense counsel] would like to present. This would be a great opportunity for her to provide that to us, because * * * she [gave] us a Criminal 16 discovery request, we provided her a video, [and] we provided her a letter specifically laying out every witness. We provided her a lot of things. We've got absolutely nothing back.

{¶55} "So I'd like to be able to have those things in a reasonable period of time so we have a chance to look at it, the same way I gave her the courtesy of being able to look.

{¶56} "THE COURT: Next Tuesday seems fair enough to me. You know who you're going to be calling.

{¶57} "[DEFENSE COUNSEL]: * * * [F]or the record, * * * Criminal Rule 16 discovery (inaudible) probation rules that the defendant has a right to see the evidence in advance.

{¶58} "[PROSECUTOR]: The letter says Criminal Rule 16.

{¶59} "* * *

{¶60} "[PROSECUTOR]: Your letter says that.

{¶61} "THE COURT: So reciprocal discovery is what [the prosecutor] is saying, and you have to provide him with the same types of evidence he is providing you with.

11

So its ordered that you, by next Tuesday, provide him with items required under Criminal Rule 16, which you've used.

{¶62} "[DEFENSE COUNSEL] (Inaudible) okay."

{¶63} On the second hearing date after the state rested, the Browns called Dr. Price to testify. They said they wanted to have Price testify as an expert but that he did not create a report. After an objection by the LCHS, the court limited Price to a factual witness and did not allow him to give his medical opinions or analyze the medical records. The Browns did evidently list him as a witness in advance of this second hearing date, but they did not identify him as an expert witness or a veterinarian. Thus, the LCHS argued it would be unfairly prejudiced had Price been permitted to testify without notice that he was an expert in advance of the hearing. The court agreed, ruling: "You can't ask him anything that would draw upon his expertise * * * [or to] make observations about the cats he examined that are the subject of the case, in which he gave no written report * * *." It allowed him to testify as a fact witness but not an expert.

{¶64} In light of these facts, we do not find error. The court ordered the Browns to exchange their evidence with the LCHS in advance of the second hearing date consistent with Crim.R. 16. They did not. Regardless of whether Crim.R. 16 applies, the Browns were on notice that the court directed compliance with Crim.R. 16 to regulate the fair exchange of discovery between the parties. Thus, the court did not err in excluding the Browns' expert who had not been identified in advance of the hearing. *State v. Wolford-Lee*, 11th Dist. Lake No. 2017-L-122, 2018-Ohio-5064, ¶ 62, *appeal not allowed,* 155 Ohio St.3d 1421, 2019-Ohio-1421, 120 N.E.3d 868. The Browns' first assignment lacks merit.

12

{¶65} We address the Browns' fourth and fifth assigned errors collectively, which contend:

{¶66} "[4.] The Trial Court abused its discretion when it found that the Browns violated the first and second terms of probation.

{¶67} "[5.] The Trial Court abused its discretion when it found that the Browns violated the third term of probation."

{¶68} After a two-day hearing, the court found that both Tom and Judith Brown violated terms one, two, and three of their community control. The Browns raise four arguments claiming the court erred in finding they violated.

{¶69} When reviewing challenges to the state's evidence that a community control violation occurred, we review the evidence and assess whether the state presented substantial proof that a violation occurred. *State v. Fears*, 2018-Ohio-1468, 110 N.E.3d 951, ¶ 17 (5th Dist.). It is not required to prove the individual committed the offense beyond a reasonable doubt. *Id.* Instead, the standard "is highly deferential to the decision of the trial court and is akin to a preponderance of the evidence burden of proof. *See State v. Alderson*, 4th Dist. Meigs No. 98CA12, 1999 WL 713594 (Aug. 31, 1999)." *Id.*

{¶70} Therefore, "the state has to introduce evidence tending to show that it was more probable than not that the probationer violated the terms of his or her probation." *State v. Stockdale*, 11th Dist. Lake No. 96-L-172, 1997 WL 663688, *3; *State v. Russell*, 11th Dist. Lake No. 2008-L-142, 2009-Ohio-3147, ¶ 7. Moreover, appellate courts should not second guess the court's credibility determinations, which are issues for the trier of fact. *Fears, supra,* at ¶ 17.

{¶71} Once a court finds community control was violated, its decision whether to revoke community control is discretionary, and we review that decision for an abuse of discretion. *Id.* at ¶ 18.

{¶72} The Browns' community control terms state:

{¶73} "1. You are not to own, care for or keep any animal in an inhumane, unsanitary or unlawful manner, or be associated, in any capacity, directly or indirectly, with any facility which does so, including Caroline Kids Pet Rescue.

{¶74} "2. Any animal care or rescue organization which you do associate with as a primary operator or owner is subject to random, unannounced inspections by a veterinarian who may be accompanied by a probation officer and/or a representative of the Lake County Society. Lake County Humane Society and you shall agree on such veterinarian within 3 weeks and notify the probation department of his or her identity. If Lake County Humane Society and you cannot agree, then each shall nominate a person in writing to be filed at the Court forthwith and the Court shall appoint. Inspections shall include the right and opportunity to view and copy records concerning the animals' care or any other matter connected with the facility pertaining to animal care provided by it.

{¶75} "3. You shall not associate with any facility which cares for more than 105 animals, regardless of its location(s).

{¶76} "4. You shall be responsible for the cost of the veterinarian."

{¶77} The Browns' first and second arguments challenge their violation of the first term of community control, i.e., that they kept and cared for cats at their facility in an inhumane manner. First, they argue that the LCHS had to prove they acted negligently in caring for the animals. We disagree. Instead, the LCHS had to prove the Browns

14

maintained animals in an inhumane, unsanitary, or unlawful manner consistent with the language employed in their community control terms. There is no negligence requirement. Thus, their first argument lacks merit.

{¶78} Second, the Browns contend the LCHS failed to carry its burden and establish that the animals were inhumanely treated because the state relied on a layperson's testimony to establish that the animals were sick and did not use an expert.

{¶79} Inhumane is defined as "extremely cruel; causing unacceptable suffering." *Black's Law Dictionary* (11th Ed. 2019).

{¶80} "The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Rhines*, 2d Dist. Montgomery No. 23486, 2010-Ohio-3117, 2010 WL 2643310, ¶ 39. Moreover, because a community control revocation hearing is not a criminal trial, it has relaxed rules of evidence and procedure. *Columbus v. Bickel,* 77 Ohio App.3d 26, 36, 601 N.E.2d 61 (10th Dist.1991). Accordingly, revocation hearings are not subject to the rules of evidence. *State v. Harian*, 8th Dist. Cuyahoga No. 97269, 2012-Ohio-2492, ¶ 16.

{¶81} Ordinarily, Evid.R. 702 governs and dictates that "a witness may testify as an expert if all of the following apply:

{¶82} "(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

{¶83} "(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

15

{¶84} "(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:

{¶85} "(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;

{¶86} "(2) The design of the procedure, test, or experiment reliably implements the theory;

{¶87} "(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result."

{¶88} As stated, Megan Newkirk, a veterinarian assistant for 20 years, testified for LCHS. She is an LCHS employee who was present during the September 2019 shelter inspection. She saw at least 20 cats with snotty noses, ten to 20 cats with open-mouth breathing, 28 with dental problems or painful tooth disease, and two to three cats appearing to have ringworm. Newkirk also observed that the animals were freely roaming throughout the home even though some of the cats had highly contagious diseases. Newkirk wanted to take eight of the cats for immediate medical treatment, but the Browns did not allow her to take any. Newkirk was also present during the inspection in 2018 during which she saw many of the same conditions.

{¶89} Although Evid.R. 702 compliance was not required, Newkirk's testimony about her credentials established she had ample experience in caring and helping to treat and diagnose animals. Her testimony and credentials were before the court for it to consider when assessing the evidence. Moreover, the Browns did not object to her

16

testimony on this basis at the hearing. Thus, they waive all but plain error. A plain error finding will lie in "extremely rare cases where exceptional circumstances require its application to prevent a manifest miscarriage of justice ** *." *State v. Morgan*, 153 Ohio St.3d 196, 2017-Ohio-7565, 103 N.E.3d 784.

{¶90} Here, the trial court believed Newkirk's account detailing the conditions found in the shelter and held that there was "convincing testimony that up to 48 of the 105 plus animals housed at the facility suffered from neglect of various conditions and were in need of veterinary care." Based on the foregoing, there was evidence showing that it was more probable than not that the Browns kept certain cats in an inhumane condition based on Newkirk's testimony that they were suffering from ailments requiring urgent veterinarian care.

{¶91} Thus, there is no plain error and their second argument lacks merit. We affirm the court's decision finding the Browns violated the first condition of their community control.

{¶92} The Browns' third argument claims the court erred by finding they violated the second term of their community control requiring them to cooperate with LCHS's random inspections. The Browns argue that the parties never had an agreed upon veterinarian, and therefore, term two of their community control regarding inspections did not apply at the time of the 2019 inspection.

{¶93} In support, the Browns argue that the LCHS 2018 shelter inspection that was referenced during the revocation hearing and construed by the trial court as the Browns waiving their right to agree to a veterinarian was an inspection conducted under their appeal bond conditions, and not their terms of community control. Consequently,

17

they assert the 2018 inspection that was led by Wolfgang has no bearing on whether the Browns consented to Wolfgang as the agreed upon veterinarian consistent with the terms of their community control.

{¶94} As they allege, the Browns' sentence was stayed pending the direct appeal of their convictions from approximately October 2017 until December 17, 2018 when we affirmed their convictions. Thus, before December 2018, they were not subject to the community control terms in their sentencing judgment. Instead, the Browns claim the 2018 inspection was conducted pursuant to the terms in their appeal bond. The LCHS does not challenge this contention. The terms of the appeal bond are not before us.

{¶95} The trial court found that the Browns failed to cooperate with inspections by "failing to timely agree to a veterinarian in a timely fashion as required by Term No. 2. After agreeing to Dr. Wolfgang in the 2018 annual inspection, they unjustifiably reneged on his inspection efforts on September 3, 2019. They failed to fully cooperate with the random inspections * * *."

{¶96} We disagree with the conclusion that Browns consented to Wolfgang as the agreed upon veterinarian under their community control terms based on Wolfgang's prior 2018 inspection. The Browns' community control conditions did not yet apply.

{¶97} However, we agree with the court's conclusion that the Browns failed "to timely agree to a veterinarian in a timely fashion as required by Term No. 2." As stated, term two of their community control required the Browns to agree on a veterinarian with the LCHS to perform the inspections within three weeks. If the parties did not agree, term two required each to "nominate a person in writing to be filed at the Court forthwith and the Court shall appoint * * *." Because the Browns and the LCHS never had an agreed

18

upon veterinarian, the Browns were obligated to submit a written nomination to the court three weeks after their community control commenced. They did not, and as such, they were not in compliance with their community control. Thus, their third argument lacks merit.

{¶98} The Browns fourth and final argument contends they did not violate the third term of their community control, which precludes them from associating with a facility that houses more than 105 animals.

{¶99} The parties stipulated there were 113 cats in the building. At the beginning of the probation violation hearing, however, the Browns' attorney explained that the eight cats in the front porch area in excess of the 105 cats the Browns were allowed to have were not their cats. Instead, these cats were the property of another entity, which leased this porch area.

{¶100} The Browns argue they did not violate this condition because the eight additional cats at the shelter during the September 2019 inspection in excess of the 105-animal limit belonged to Purrfect Partners, a separate entity that the Browns do not own. The Browns claim they leased this space for its separate and independent care of dying cats. And absent these additional eight cats, the Browns did not exceed their 105-animal limit.

{¶101} Jacqueline Childers testified that she, as a Purrfect Partners board member, leased the porch area from the Browns. Childers said her eight cats are confined to one room. Judith Brown testified that they do not provide food or veterinary care for the cats owned by Purrfect Partners.

{¶102} However, the written lease agreement does not require Purrfect Partners to pay the Browns rent.  Childers testified that she does not pay for the space in cash but paid them by doing errands or services on their behalf.   Neither party to the lease, however, maintained records of the services Childers performed.   Purrfect Partners likewise did not pay for utilities.

{¶103} The trial court judge responded, "I'm not buying that. * * * This was part of the premises."

{¶104} "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts."  *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967).  The trial court's decision makes it clear that she did not give much weight to Childers' testimony.  Instead, the court determined that the lease agreement was a contrived way for the Browns to circumvent their community control conditions and to care for more cats at their shelter.

{¶105} We agree that the LCHS presented evidence showing that it was more probable than not that the Browns had more than 105 cats at their shelter at the time of the September 2019 inspection.  Thus, this argument lacks merit, and the Browns' fourth and fifth assignments lack merit.

{¶106} The trial court's decision is affirmed.


TIMOTHY P. CANNON, P.J.,

MATT LYNCH, J.,

concur.