[Cite as *State v. Ellis*, 2025-Ohio-1014.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## LAKE COUNTY

| | |
|---|---|
| STATE OF OHIO, | CASE NO. 2024-L-061 |
| Plaintiff-Appellee, | |
| - vs - | Criminal Appeal from the Court of Common Pleas |
| WILLIAM ELLIS, | |
| Defendant-Appellant. | Trial Court No. 2023 CR 000988 |

# O P I N I O N

Decided: March 24, 2025
Judgment: Affirmed

*Charles E. Coulson*, Lake County Prosecutor; *Teri R. Daniel*, *Kristi L. Winner,* and *Jennifer A. McGee*, Assistant Prosecutors, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Vanessa R. Clapp*, Lake County Public Defender, 125 East Erie Street, Painesville, OH 44077 and *Paul J. Lubonovic*, Assistant Public Defender, 100 West Erie Street, Painesville, OH 44077 (For Defendant-Appellant).

JOHN J. EKLUND, J.

{¶1} Appellant, William Ellis, appeals the judgment of conviction from the Lake County Court of Common Pleas after a jury trial where he was found guilty of Possession of Drugs, a fifth-degree felony in violation of R.C. 2925.11(A).

{¶2} Appellant has raised one assignment of error arguing that the trial court erred by denying his Motion to Suppress, in which Appellant asserted that the State did not obtain voluntary, third-party consent to search the vehicle where police officers recovered a baggie of cocaine that had Appellant's DNA on it.

**{¶3}** Having reviewed the record and the applicable caselaw, we find Appellant's assignment of error to be without merit. The State appropriately obtained voluntary consent to search the vehicle in which the drugs were recovered. Moreover, the State had independent probable cause to search the vehicle based on observed illegal conduct.

**{¶4}** Therefore, the judgment of the Lake County Court of Common Pleas is affirmed.

## Substantive and Procedural History

**{¶5}** On January 9, 2024, the Lake County Grand Jury charged Appellant with one count of Possession of Drugs, a fifth-degree felony in violation of R.C. 2925.11(A). Appellant pled not guilty.

**{¶6}** On April 11, 2024, Appellant filed a Motion to Suppress, challenging the validity of the third-party consent obtained to search the vehicle in which the cocaine was recovered and challenging the search and analysis of Appellant's DNA. The State filed a response. The trial court transferred the suppression hearing to another judge because part of the challenge involved a search warrant that the judge presiding over the case had issued.

**{¶7}** The trial court held a hearing on the Motion to Suppress on May 17, 2024. At the hearing, the State called Detective-Lieutenant John Begovic and Detective David Burrington, both of the Willoughby Police Department. Detective-Lieutenant Begovic said that he had been a police officer for 32 years and Detective Burrington had been a police officer for 26 years.

**{¶8}** Detective-Lieutenant Begovic testified that he began an investigation on June 1, 2023, after the department received a call from Penelope Campbell. Campbell

2

lived at the North Turtle Trail condominiums and called to advise the department that she believed a drug transaction was taking place in the unit across from hers involving a female driving a white Mazda. Campbell had also made similar calls on May 17, 2023, and May 24, 2023. The State introduced the reports based on Campbell's prior calls, in which she described what appeared to be hand-to-hand drug transactions involving a tall, black man known to her as "Will." She described that numerous vehicles came and went from the unit.

{¶9}  When Campbell called on June 1, Detective-Lieutenant Begovic and Detective Burrington went to North Turtle Trail to investigate. While parked in the parking lot, they observed a white female, later identified as Kaylyn Keig, park a silver Scion next to a black Chevy Impala. She then entered Condo A, where Campbell had reported the suspected drug activity. Five minutes later Keig and a man Detective-Lieutenant Begovic recognized as Appellant exited the unit and entered a gray Honda SUV. Appellant got in the driver's seat and Keig got in the passenger seat, but the detectives could not see into the vehicle because the windows were tinted.

{¶10}  After five minutes, Appellant exited the Honda SUV, and, as he did, Detective-Lieutenant Begovic said that "a large plume of smoke bellowed out of the vehicle." Appellant then opened the right rear door of the Chevy Impala, removed two bags from the back seat, and put them in the Honda SUV. Appellant then removed a cardboard box from the trunk of the Chevy Impala and put it in the Honda SUV. Detective-Lieutenant Begovic said this activity was similar to what Campbell had reported and caught his attention as suspicious activity. After this, Appellant re-entered the Honda

3

SUV. He re-emerged after about five minutes, more smoke billowed out of the vehicle, and Appellant had a marijuana cigarette in his hand.

{¶11} Detective-Lieutenant Begovic and Detective Burrington approached the vehicle and called for backup. Detective-Lieutenant Begovic said that he could smell the odor of marijuana when he approached Appellant. Without prompting, Appellant said that he had a medical marijuana card and was allowed to smoke. Detective-Lieutenant Begovic placed Appellant in handcuffs and searched him. He found two cell phones in Appellant's pocket and $580.00 in cash. Keig was also handcuffed, and Detective Burrington Mirandized both Appellant and Keig.

{¶12} According to the Detectives, Keig stated that her boyfriend owned the silver Scion and that she was the listed owner of both the gray Honda SUV and the black Chevy Impala. They testified that Keig gave verbal consent to search the vehicles while handcuffed and outside of a police cruiser. Keig was then placed in a police cruiser. Detective-Lieutenant Begovic stated that he searched the Honda SUV on the basis of the marijuana use in the vehicle.

{¶13} Detective-Lieutenant Begovic said that a search of the Honda SUV revealed a used marijuana cigarette. The two bags and the box that Appellant had moved from the Impala to the Honda SUV had a quantity of marijuana in them. Officers found a small clear baggie with suspected cocaine inside the Impala on the floorboard of the driver's seat area. After recovering these items, officers release both Appellant and Keig.

{¶14} The Lake County Crime Lab tested the suspected cocaine and confirmed it was 3.38 grams of cocaine. The crime lab also indicated that the plastic baggie had touch DNA on it. Detective-Lieutenant Begovic obtained a search warrant to obtain a buccal

4

swab from Appellant. The crime lab tested the swab and confirmed it was a match for the touch DNA on the plastic baggie.

{¶15} The State also called Keig to testify. She said that she was friends with Appellant and went to the North Turtle Trail condo to swap out their cars. Her fiancé's car had "bad brakes" and Appellant "has two cars that we share so I needed to borrow one of the other cars." She said they talked about exchanging the vehicles and then Appellant began to swap out some of his stuff for the exchange. She admitted that they were smoking marijuana in the Honda SUV. Keig said that the Honda SUV was registered in her name but that Appellant paid for it.

{¶16} Keig could not remember being Mirandized by the officers. She said that she was "asked if I would consent" to the cars being searched "or the dogs would be brought in." She did not remember whether she gave consent to search the Chevy Impala or the Honda SUV. She said that she did not give consent to search the Scion because it belonged to her fiancé. She said she did not feel any consent was free or voluntary because the officers had approached her with guns drawn, had placed her in handcuffs, and had put her in the back of a police cruiser. However, she said she felt free to deny consent to search the Scion because it was not her car.

{¶17} On May 24, 2024, the trial court issued its judgment entry denying Appellant's Motion to Suppress. The trial court found that the Detectives had

> reasonable suspicion of criminal activity including smoking marijuana (which is not legal even with a medical marijuana card) and smoking marijuana while operating a vehicle, . . . the three phone calls from Campbell; Keig arriving at Unit A and almost immediately coming back out with Defendant and sitting in the Honda that had been reported by Campbell; the Honda's heavily tinted windows; the billow of smoke coming out of the Honda when Defendant exited the first time; Defendant moving items from the Impala (which had also been reported by Campbell) to the

5

Honda; the fact that the Honda was running while Defendant and Keig were inside smoking marijuana; and the second billow of smoke plus the marijuana cigarette in Defendant's hand when he exited the Honda the second time.

{¶18} The trial court also concluded that Keig, as the owner of the vehicles, had voluntarily given consent to search the vehicles and that Appellant, as the borrower, could not override the consent given by the owner at the scene and did not violate his expectation of privacy. Finally, the trial court determined there was probable cause to obtain a search warrant for Appellant's DNA.

{¶19} After the trial court denied Appellant's Motion to Suppress, the matter proceeded to jury trial before the originally assigned judge. The jury found Appellant guilty.

{¶20} On August 5, 2024, the trial court sentenced Appellant to ten months in prison with 33 days of credit for time served.

{¶21} Appellant timely appealed raising one assignment of error.

**Assignment of Error and Analysis**

{¶22} Appellant's sole assignment of error states: "THE TRIAL COURT ERRED WHEN IT DENIED DEFENDANT-APPELLANT'S MOTION TO SUPPRESS."

{¶23} Appellant acknowledges that Keig could "theoretically" give consent to search the vehicles because she at least appeared to have common authority over them. However, he argues that the State failed to demonstrate that Keig voluntarily gave consent to search the vehicles.

{¶24} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 2003-Ohio-5372, ¶ 8. At a hearing on a motion to suppress, the trial court, as the trier of fact, is in the best position to weigh the evidence by resolving

6

factual questions and evaluating the credibility of witnesses. *Id.*; *State v. Mills*, 62 Ohio St.3d 357, 366 (1992). As a result, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. *Burnside* at ¶ 8. An appellate court reviews the trial court's application of the law to its factual findings de novo. *State v. Belton*, 2016-Ohio-1581, ¶ 100. Accepting the facts as true, the reviewing court then must independently determine, without deference to the trial court, whether the trial court properly applied the substantive law to the facts of the case. *Burnside* at ¶ 8.

**{¶25}** The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const., amend. IV. The language of Article I, Section 14 of the Ohio Constitution is virtually identical and affords the same protections. *State v. Hoffman*, 2014-Ohio-4795, ¶ 11. "The touchstone of both is reasonableness." *State v. Brown*, 2020-Ohio-5140, ¶ 8 (11th Dist.).

**{¶26}** "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." (Footnote omitted.) *Katz v. United States*, 389 U.S. 347, 357 (1967). "When a defendant moves to suppress evidence recovered during a warrantless search, the state has the burden of showing that the search fits within one of the defined exceptions to the Fourth Amendment's warrant requirement." *State v. Banks-Harvey,* 2018-Ohio-201, ¶ 18.

**{¶27}** "Courts must exclude evidence obtained by searches and seizures that violate the Fourth Amendment." *State v. Adams*, 2015-Ohio-3954, ¶ 181, citing *Mapp v. Ohio*, 367 U.S. 643 (1961) (extending the exclusionary rule to the states). "'The primary

7

purpose of the exclusionary rule is to remove incentive from the police to violate the Fourth Amendment.'" *State v. Eggleston*, 2015-Ohio-958, ¶ 17 (11th Dist.), quoting *State v. Casey*, 2014-Ohio-2586, ¶ 29 (12th Dist.).

**{¶28}** "A search based on consent is one exception to the Fourth Amendment's general warrant requirement." *State v. Ferrell*, 2017-Ohio-9341, ¶ 12 (11th Dist.); *State v. Penn*, 61 Ohio St.3d 720, 723 (1991). "Appellate review of the voluntariness of consent to search is 'limited to a determination of whether the trial court's decision was "clearly erroneous,"' and an appellate court must 'accept the trial court's findings of facts and determinations regarding credibility if they are supported by competent, credible evidence.'" *Bainbridge v. Kaseda*, 2008-Ohio-2136, ¶ 27 (11th Dist.), quoting *State v. Samples*, 1994 WL 315710, *2 (11th Dist. June 24, 1994).

**{¶29}** "In order to waive his Fourth Amendment privilege against unreasonable searches and seizures, the accused must give a consent which is voluntary under the totality of all the surrounding circumstances." *State v. Childress*, 4 Ohio St.3d 217 (1983), paragraph one of the syllabus. A third party may validly give consent, but the third-party must possess "common authority over the area sought to be searched." *State v. Miller*, 117 Ohio App.3d 750, 759 (11th Dist. 1997), citing *United States v. Matlock*, 415 U.S. 164, 172 (1974).

**{¶30}** "'[W]hen the subject of a search is not in custody,'" the State must "'demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied.'" *State v. Robinette*, 80 Ohio St.3d 234, 242-243 (1997), quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 248 (1973). "When an individual is lawfully detained by police and consents to a search, the state must demonstrate by clear

8

and convincing evidence that consent was freely and voluntarily given." *State v. Clark*, 2024-Ohio-1869, ¶ 14 (10th Dist.); *Florida v. Royer*, 460 U.S. 491, 497 (1983) ("the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority.").

> Important factors for the trial court to consider in determining whether a consent was voluntary include the following: (1) the suspect's custodial status and the length of the initial detention; (2) whether the consent was given in public or at a police station; (3) the presence of threats, promises, or coercive police procedures; (4) the words and conduct of the suspect; (5) the extent and level of the suspect's cooperation with the police; (6) the suspect's awareness of his right to refuse to consent and his status as a "newcomer to the law"; and (7) the suspect[']s education and intelligence.

*State v. Riggins*, 2004-Ohio-4247, ¶ 15 (1st Dist.), citing *Schneckloth* at 248-249; *State v. Lett*, 2009-Ohio-2796, ¶ 33 (11th Dist.) (adopting *Riggins*).

{¶31} In *State v. Rath*, 2023-Ohio-2118, ¶ (11th Dist.), we assessed the totality of the circumstances and determined that the defendant had voluntarily consented to the search of his person. *Id.* at ¶ 13. At the time officers asked for consent to search his person, Rath was reluctant and initially denied consent. *Id.* at ¶ 14. However, the "interaction between Rath and the police was cooperative rather than confrontational, occurred in a public space, and was of brief duration." *Id.* Although there were numerous officers at the scene, only a couple were actively engaged with Rath. *Id.* Further, "[t]he fact that Rath was under investigatory detention when he gave his consent does not ipso facto render the consent involuntary." *Id.*; *State v. Fouch*, 2015-Ohio-1784, ¶ 28 (5th Dist.) (the fact that defendant was in custody "did not affect the voluntariness of [her] consent to search"). We said that a detective's statements to Rath that they suspected him of drug trafficking and that their suspicions would have to be eased before he would be free to

9

Case No. 2024-L-061

leave "simply reflected the actual circumstances of the situation" and did not constitute threat or coercion. *Rath* at ¶ 14.

**{¶32}** In this case, when Detective-Lieutenant Begovic and Detective Burrington approached Appellant and Keig, they were both placed in handcuffs. Detective Burrington said that he read Keig her Miranda rights and Keig gave consent to search her vehicles before she was placed in a police cruiser. Although Keig had been detained, she had received her Miranda rights, had not been placed under arrest, had not yet been placed in a police cruiser, and was in a public place at the time she was asked for consent to search the vehicles.

**{¶33}** Keig's testimony indicated that she did not remember whether she gave consent to search the Chevy Impala and the Honda SUV. However, she said that she did not give consent to search the Scion because it was her fiancé's vehicle.[1] Keig's stated denial of consent to search one vehicle supports the conclusion that she was aware of her right to refuse consent. The inability to remember granting consent to search her own vehicles also tends to undermine the credibility or reliability of her testimony.

**{¶34}** The trial court's judgment entry found that Keig testified that if she refused consent, the Detectives told her that "the dogs would be brought in," rendering her consent involuntary. However, the trial court did not find her "testimony to be credible on that point." There was no testimony from either of the Detectives to suggest they made such a statement to Keig. The totality of the circumstances here bears similarity to *Rath* and leads us to conclude that the trial court's determination that Keig voluntarily gave

---

1. Despite this discrepancy in the testimony, officers searched the Scion and found nothing of note.

10

Case No. 2024-L-061

consent to search the Chevy Impala where the cocaine was located was not clearly erroneous. *See Kaseda*, 2008-Ohio-2136, at ¶ 27 (11th Dist.).

**{¶35}** Finally, regardless of Keig's consent to search the Chevy Impala, the search was justified under the automobile exception allowing the warrantless search of a vehicle when law enforcement has probable cause to believe the vehicle contains contraband. *See State v. Welch,* 18 Ohio St.3d 88, 91 (1985). The Detectives watched as Appellant and Keig smoked marijuana in the Honda SUV and noted an odor of marijuana. The odor of marijuana alone is sufficient probable cause to search a vehicle. *State v. Moore*, 90 Ohio St.3d 47, 50 (2000). Therefore, the Detectives had probable cause to search the Honda SUV.

**{¶36}** The Detectives then observed Appellant transfer items from the Chevy Impala into the Honda SUV. Once officers searched the Honda SUV, they found a used marijuana cigarette and also found a quantity of marijuana in the items Appellant had transferred from the Chevy Impala to the Honda SUV. Because the Detectives had established that Appellant had transferred an illegal substance from one vehicle to the other, they likewise would have had probable cause to believe Appellant was engaged in the transfer of illegal narcotics related to the Chevy Impala. Therefore, there was an independent justification to search the Chevy Impala beyond Keig's consent to do so, and the cocaine in the Impala would have been inevitably discovered. *See Rath*, 2023-Ohio-2118, at ¶ 15 (11th Dist.).

**{¶37}** Accordingly, Appellant's sole assignment of error is without merit.

Case No. 2024-L-061

{¶38} For the foregoing reasons, the judgment of the Lake County Court of Common Pleas is affirmed.

EUGENE A. LUCCI, J.,

SCOTT LYNCH, J.,

concur.

12