[Cite as *State v. Lewis*, 2026-Ohio-422.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio/City of Bowling Green       Court of Appeals No. {87}WD-25-029

      Appellee       Trial Court No. 24TRC00640

v.

Damani C. Lewis       **<u>DECISION AND JUDGMENT</u>**

      Appellant       Decided: February 10, 2026

* * * * *

Michael B. Kelley, for appellant.

* * * * *

**SULEK, J.**

{¶ 1} Appellant Damani Lewis appeals the judgment of the Bowling Green Municipal Court finding him in violation of the terms of his community control. For the reasons that follow, the trial court's judgment is affirmed.

### I. Factual Background and Procedural History

{¶ 2} On March 30, 2024, Lewis pleaded no contest to one count of reckless operation of a motor vehicle in violation of Bowling Green Municipal Code 73.10(B), a misdemeanor of the fourth degree, and one count of a traffic control device offense in

violation of Bowling Green Municipal Code 70.15, a minor misdemeanor. The trial court found him guilty and placed him on community control.

{¶ 3} On February 21, 2025, Lewis appeared before a magistrate on an alleged community control violation.[1] Lewis admitted to the violation, and the magistrate found that the violation occurred. The online docket from the Bowling Green Municipal Court shows that Lewis was then ordered "to be placed on SCRAM for 30 days w/out any violations." SCRAM refers to a continuous alcohol monitoring system. The trial court adopted the magistrate's decision on March 5, 2025.

{¶ 4} On March 10, 2025, Lewis appeared again for a community control violation hearing for an alleged SCRAM violation that occurred on March 1, 2025. The matter was continued to April 21, 2025.

{¶ 5} At the April 21, 2025 hearing, the trial court took testimony and evidence regarding the alleged March 1, 2025 violation, as well as two additional violations that allegedly occurred between April 11 and April 13, 2025.

{¶ 6} Lewis's probation officer, Amber Leemaster, testified that Lewis was on community control for his reckless operation offense. The conditions were that he was to complete a driver intervention program, have no violations for operating a motor vehicle without privilege to do so, and have no traffic offenses involving alcohol or drugs of abuse. Leemaster stated that after Lewis's community control violation on February 21,

---

[1] The violation was related to another charge of reckless operation that Lewis received in February 2025 in case No. 2024-TRC-07551. That case was Lewis's third reckless operation charge. Case No. 2024-TRC-07551 is not part of this appeal.

2.

2025, the trial court placed him on SCRAM for 30 days and ordered him not to have any violations. When he was placed on SCRAM, Leemaster explained the rules of the bracelet, including that he should not submerge it in water, drink alcohol, or use products containing alcohol such as spray fragrances or colognes. Lewis signed an agreement acknowledging the rules of SCRAM.

{¶ 7} Leemaster testified that she received notice of a SCRAM violation occurring on March 1, 2025, and subsequently received notice of two more violations occurring on April 10 and April 12, 2025. The SCRAM violations indicated to her that Lewis consumed alcohol during that time, and she considered them to be direct violations of the conditions of Lewis's probation. She recommended that Lewis be sentenced to five days in jail and that he continue to be subject to SCRAM until he reports to jail.

{¶ 8} Jeremy Adams also testified for the State. Adams is the Western Territory Manager for Ohio Alcohol Monitoring Systems. Adams described how the SCRAM functions by taking a reading approximately every 30 minutes to detect levels of transdermal alcohol concentration (TAC) in the person's sweat vapor. According to the SCRAM Systems Non-Compliance Report entered into evidence, to meet the standard of a finding of alcohol consumption, the TAC level must start at zero. It must then rise by less than .10 TAC per hour to a peak. It must then decline by less than or equal to .035 TAC per hour back to a TAC level of zero. Finally, it must pass the "Environmental Contaminant Test." Adams testified that the standards for the rate of the rise and fall of TAC correlates to how quickly the human body can metabolize alcohol. He explained

3.

that if the rise or fall happens too fast, it would indicate that the reading was not from something that the person consumed, but rather was from the environment.

{¶ 9} Adams also explained that when elevated TAC readings occur, the computer will generate an "alert" that will be examined by a data analyst. The alert is then sent to one of his colleagues, who reviews it again to make sure that it meets the criteria for a consumption event. Adams then forwards the report to whoever is supervising the person's SCRAM.

{¶ 10} Adams testified that Lewis had three different events where alcohol was detected.

{¶ 11} On March 1, 2025, Lewis had a TAC level of zero at 1:33 a.m. It rose to a peak of .042 at 3:35 a.m. It then fell until it reached zero again at 9:44 a.m. Adams stated that the levels and rate of rise and fall met the standards for a confirmed consumption of alcohol event. He further testified that there was no indication of "an outside interfering of alcohol."

{¶ 12} The second event occurred starting on Thursday, April 10, 2025, at 9:16 p.m., and continued until Friday, April 11, 2025, at 1:44 p.m. Lewis's TAC level rose to a peak of .079 at 1:58 a.m. It then fell to around zero at approximately 4:30 a.m., before rising to approximately .025 at the next reading. It then fell gradually until approximately 12:30 p.m. when it increased again to just above .025 before falling to zero at 1:44 p.m. Adams testified that although the event was longer, it still met the criteria for a confirmed consumption of alcohol event. On cross-examination, he testified

4.

that he could not speak to what caused the rise in Lewis's TAC levels around 5:00 a.m. and 12:30 p.m., and he acknowledged that those readings could have been from outside contaminants. He, however, stated that the overall event met the criteria for alcohol consumption. He further testified that the SCRAM is calibrated to avoid contamination of data and that Lewis's SCRAM unit was "within calibration."

{¶ 13} The third event occurred between Saturday, April 12, 2025, at 6:59 p.m. and Sunday, April 13, 2025, at 12:29 p.m. Lewis's TAC level rose to a peak of .124 at 3:42 a.m. before falling to zero again at 12:29 p.m. Adams testified that the "zero to peak and the peak to zero matches the criteria specific to alcohol consumption within the body," and was not consistent with outside interference.

{¶ 14} Following Adams's testimony, the State rested.

{¶ 15} Lewis then testified in his own defense. He denied consuming any alcohol and suggested that the readings must have been from environmental alcohol. Specifically, he testified that on March 1, 2025, he was in Detroit celebrating a friend's birthday with a group of people. Alcohol was present and others were drinking, but he did not drink. Similarly, on April 10 through April 13, 2025, he was in Florida with a group of friends on vacation. During those days, he would go to the "strip," where there were restaurants and bars. Again, he testified that alcohol was present, and others were drinking, but he was not. He also noted that it was hot in Florida and he was sweating, and someone may have spilled a drink on him. Lewis was adamant that he had not consumed alcohol since February 21, 2025.

5.

{¶ 16} Lewis next presented the testimony of Sharese Allen and Brooke Brown. Both Allen and Brown testified that they were in Detroit at the party on March 1, 2025. They testified that the group was together the whole night, and although they were drinking, they did not see Lewis drinking.

{¶ 17} Lewis also presented the testimony of Maliah Huston and Josh Keeble. Huston and Keeble testified that they were with Lewis in Florida. Similar to Allen and Brown, they testified that the group was drinking, but Lewis was not. Keeble explained that everyone knew that Lewis was not allowed to consume alcohol.

{¶ 18} Finally, Lewis attempted to call Camryn Nadir as a witness. Upon inquiry from the trial court, defense counsel acknowledged that Nadir was going to provide "the exact same testimony" as Huston and Keeble. The court requested that counsel proffer the testimony because "I feel like it's kind of repetitive to have the witnesses to keep testifying." Counsel then proffered that Nadir would have testified that she was with Lewis in Florida, that they went to bars and restaurants together, that she was consuming alcohol, but that she noticed Lewis was not drinking and she did not believe that he had been drinking.

{¶ 19} Following the presentation of the evidence, the trial court found that a community control violation occurred. Specifically, it stated, "The Court does not believe that quote alcohol in the atmosphere is enough for a violation for the first one, as well as there was a peak level of .124 on April 13th." It then sentenced Lewis to serve five days in the Wood County jail and ordered him to be placed on SCRAM for 90 days

6.

after his release.  The trial court allowed Lewis to report to jail on May 5, 2025, after he graduated from Bowling Green State University.

## II. Assignments of Error

{¶ 20} Lewis timely appeals the judgment of the Bowling Green Municipal Court, asserting one assignment of error for review:

> 1. The trial court erred when it found the Appellant in violation of community control / probation as the finding was against the manifest weight of the evidence, and based upon insufficient evidence.

## III. Analysis

{¶ 21} In support of his assignment of error, Lewis makes two arguments.  First, he argues that the trial court's finding of a community control violation is against the manifest weight of the evidence.  Second, he argues that the finding of a community control violation is based on insufficient evidence because the terms of his community control did not include a provision that he could not drink.  This court will address the second argument first.

{¶ 22} Lewis correctly contends that the original terms of his community control did not prohibit him from drinking.  He incorrectly argues, however, that the trial court could not modify those terms following his February 21, 2025 violation.

{¶ 23} R.C. 2929.25(D)(2) provides, in relevant part, "[I]f an offender violates any condition of a community control sanction, the sentencing court may impose upon the violator one or more of the following penalties:  . . . (b) A more restrictive community control sanction."  Here, Lewis violated the original terms of his community control

7.

when he committed another reckless operation offense in February 2025. For that violation, the trial court imposed an additional community control sanction of continuous alcohol monitoring. Continuous alcohol monitoring without house arrest is a nonresidential sanction specifically provided for in R.C. 2929.27(A)(2). Lewis, therefore, was properly subject to continuous alcohol monitoring as part of his community control.

{¶ 24} Lewis separately argues that even if wearing the SCRAM monitor was a condition of his community control, the rules of SCRAM do not also become terms of his community control. He maintains that while he may have violated the rules of SCRAM, he did not violate his community control because he did in fact wear the SCRAM bracelet.

{¶ 25} Upon review, it is not necessary to resolve Lewis's argument in the abstract because in this case the trial court specifically ordered him "to be placed on SCRAM for 30 days w/out any violations." Not violating the SCRAM rules, therefore, was a condition of Lewis's community control.

{¶ 26} This leads back to Lewis's first argument, which is that the trial court erred when it found that Lewis had multiple SCRAM violations. Lewis challenges the merits of the trial court's findings, arguing that they were against the manifest weight of the evidence. Appellate courts, however, apply a different standard when reviewing community control violations.

8.

**{¶ 27}** "A community control revocation is not a criminal trial; therefore, the state is not required to establish a violation of the terms of community control 'beyond a reasonable doubt.'" *State v. Pavlich*, 2011-Ohio-802, ¶ 23 (6th Dist.), quoting *State v. Ryan*, 2007-Ohio-4743, ¶ 7 (3d Dist.), citing *State v. Hylton*, 75 Ohio App.3d 778 (4th Dist.1991). "Instead, the state must show 'substantial' proof that the offender violated the terms of his or her community control sanctions." *Id.*, citing *Ryan* at ¶ 7; *State v. Backus*, 2023-Ohio-3222, ¶ 33 (5th Dist.); *State v. Brown*, 2020-Ohio-5140, ¶ 69 (11th Dist.); *State v. Satterwhite*, 2017-Ohio-223, ¶ 9 (2d Dist.). "The test ordinarily applied is highly deferential to the decision of the trial court and is akin to a preponderance of the evidence burden of proof." *State v. Fears*, 2018-Ohio-1468, ¶ 17 (5th Dist.), quoting *State v. Hayes*, 2001 WL 909291, *2 (6th Dist. Aug. 10, 2001). "Accordingly, the court's conclusion must be sustained if there is competent credible evidence to support it." *Id.*, quoting *Hayes* at *2.

**{¶ 28}** Here, the SCRAM Systems Non-Compliance Report and Adams's testimony presented competent, credible evidence that Lewis violated the terms of his community control. Together they described that Lewis's TAC levels increased and decreased on the nights of March 1, April 10, and April 12, 2025, in a manner consistent with alcohol consumption.

**{¶ 29}** Lewis nonetheless points to his own testimony and that of his friends as proof that he was not drinking on the nights in question.

9.

{¶ 30} As an initial matter, he argues that the trial court lost its way in that it failed to consider the testimony of Nadir. Although under Evid.R. 101(D)(3) the rules of evidence do not apply to "proceedings with respect to community control sanctions," those rules would have allowed the trial court to exclude Nadir's testimony "if its probative value is substantially outweighed by considerations of . . . needless presentation of cumulative evidence." Evid.R. 403(B). Here, Nadir's testimony was needlessly cumulative as he would have been the fifth defense witness, and defense counsel admitted that he would have provided "the exact same testimony" as the others. The trial court, therefore, did not lose its way when it accepted a proffer of Nadir's testimony instead of having the witness testify.

{¶ 31} Turning to Lewis's main contention, he argues that the trial court should have believed him and the other defense witnesses over Adams and the SCRAM Systems Non-Compliance Report. He points to what he calls the "false positives" that SCRAM detected later in the day on April 11, 2025, to suggest that the SCRAM was not reliable. Adams, however, did not agree that those were "false positives." He testified that the rises that occurred around 5:00 a.m. and 12:30 p.m. on that day were not analyzed separately, but were considered as part of the total incident, and that the incident itself fell within the parameters of a confirmed consumption event. He also testified that Lewis's SCRAM was properly calibrated. Notably, even if the 5:00 a.m. and 12:30 p.m. readings were the result of something other than consumption, that does not explain the

10.

readings from earlier that night, and from March 1 and April 13, 2025, all of which were consistent with alcohol consumption.

{¶ 32} Finally, as to the credibility of the defense witnesses' testimony, the trial court's determination is afforded special deference as it "has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor." *State v. Garibaldo*, 2025-Ohio-1093, ¶ 71 (6th Dist.), citing *State v. Fell*, 2012-Ohio-616, ¶ 14 (6th Dist.). In this case, the trial court considered the testimony of the defense witnesses but found that testimony less compelling than Adams's testimony about the findings of the SCRAM Systems Non-Compliance Report. Upon review, the trial court's finding that Lewis's TAC levels were from alcohol consumption instead of environmental factors is supported by the circumstances of Lewis's presence at parties and bars with his friends who were drinking, the rate of the rise and fall of his TAC levels, and the peak TAC levels reached.

{¶ 33} Accordingly, the trial court's finding that Lewis committed a community control violation is supported by competent, credible evidence. Lewis's assignment of error is not well-taken.

11.

## IV. Conclusion

**{¶ 34}** For the foregoing reasons, the judgment of the Bowling Green Municipal Court is affirmed. Lewis is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.


Gene A. Zmuda, J.                          _____
                                                              JUDGE

Myron C. Duhart, J.

                                                   _____
Charles E. Sulek, J.                                          JUDGE
CONCUR.

                                                   _____
                                                              JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions. Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.